Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/01/2016 09:05 AM CDT

State of Nebraska, appellee, v.
Dylan Cardeilhac, appellant.
___ N.W.2d ___

Filed April 1, 2016.    No. S-15-217.

1. **Jury Instructions.** Whether the jury instructions given by a trial court
   are correct is a question of law.
2. **Judgments: Appeal and Error.** When reviewing questions of law, an
   appellate court resolves the questions independently of the conclusion
   reached by the lower court.
3. **Criminal Law: Motions for New Trial: Appeal and Error.** In a crimi-
   nal case, a motion for new trial is addressed to the discretion of the trial
   court, and unless an abuse of discretion is shown, the trial court's deter-
   mination will not be disturbed.
4. **Sentences: Appeal and Error.** An appellate court will not disturb a sen-
   tence imposed within the statutory limits absent an abuse of discretion
   by the trial court.
5. **Criminal Law: Jury Misconduct: Proof.** A criminal defendant claim-
   ing jury misconduct bears the burden of proving, by a preponderance
   of the evidence, (1) the existence of jury misconduct and (2) that such
   misconduct was prejudicial to the extent that the defendant was denied a
   fair trial.
6. **Witnesses: Juror Misconduct: Proof.** An appellate court reviews the
   trial court's determinations of witness credibility and historical fact for
   clear error and reviews de novo the trial court's ultimate determination
   whether the defendant was prejudiced by juror misconduct.
7. **Jury Misconduct: Trial: Appeal and Error.** When an allegation of
   jury misconduct is made and is supported by a showing which tends to
   prove that serious misconduct occurred, the trial court should conduct an
   evidentiary hearing to determine whether the alleged misconduct actu-
   ally occurred. If it occurred, the trial court must then determine whether
   it was prejudicial to the extent that the defendant was denied a fair trial.
   If the trial court determines that the misconduct did not occur or that it

was not prejudicial, adequate findings are to be made so that the determination may be reviewed.

8. **Jury Misconduct: Rules of Evidence.** The duty to hold an evidentiary hearing with regard to allegations of jury misconduct does not extend to matters which are barred from inquiry under Neb. Evid. R. 606(2), Neb. Rev. Stat. § 27-606(2) (Reissue 2008).

9. **Homicide: Sentences: Minors.** A juvenile convicted of a homicide offense cannot be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing.

10. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

Appeal from the District Court for Scotts Bluff County: Travis P. O'Gorman, Judge. Affirmed.

James R. Mowbray and Todd W. Lancaster, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, and Cassel, JJ.

Miller-Lerman, J.
### NATURE OF CASE
Dylan Cardeilhac was convicted by a jury of second degree murder in the district court for Scotts Bluff County. The court sentenced Cardeilhac, who was 15 years old at the time of the murder, to imprisonment for 60 years to life. Cardeilhac appeals his conviction and sentence. He claims that the court improperly instructed the jury that it would be required to deliberate until 9 p.m. before it could break for the day, that juror misconduct requires a new trial, and that his sentence should be vacated because the sentencing process failed to

comply with proper juvenile sentencing principles. We affirm Cardeilhac's conviction and sentence.

## STATEMENT OF FACTS

In February 2014, when he was 15 years old, Cardeilhac was being detained in the juvenile section of the Scotts Bluff County Detention Center (SBCDC) awaiting trial on charges which included one count of robbery. At around 2 a.m. on February 14, Amanda Baker, a correctional officer employed at SBCDC, was performing a bed check in the juvenile males section of the facility. Videos from SBCDC show that Baker entered Cardeilhac's cell and that she leaned forward to look at something on the floor to which Cardeilhac was pointing. Baker got down on her hands and knees and took a closer look. As Baker rose to one knee and attempted to stand, Cardeilhac moved behind her and put his arms around her neck and face. The two fell to the ground, with Baker face down and Cardeilhac on her back. Cardeilhac kept his arms wrapped around Baker's neck and released his arms only after Baker stopped struggling. Cardeilhac then searched Baker's person and retrieved keys. He left his cell and was later found in another cell. Minutes after Cardeilhac left his cell, another correctional officer found Baker lying on the cell floor. Despite the efforts of other correctional offices and emergency responders to revive her, Baker died. An autopsy showed that Baker died of asphyxia due to manual strangulation.

Evidence at trial indicated that prior to February 14, 2014, Cardeilhac and other detainees in the juvenile section of SBCDC had discussed plans to escape from the facility. The plans included, inter alia, "choking out" a guard in order to get keys. Cardeilhac indicated during such discussions that he would be willing to choke a guard. Other evidence indicated that another juvenile detainee pressured Cardeilhac to take part in an escape. After Cardeilhac choked Baker and left his cell, he went to other juveniles' cells, but they declined to escape with him. He eventually went to another cell, where he was found by guards.

The State charged Cardeilhac with first degree murder. At trial, the jury was given the option of convicting Cardeilhac of first degree murder, second degree murder, or unintentional manslaughter. The evidence at trial included testimony by various witnesses. Videos from SBCDC depicting the events in Cardeilhac's cell on February 14, 2014, were received into evidence and played for the jury.

At the jury instruction conference, Cardeilhac objected to an instruction in which the court was to advise the jury regarding its deliberations. Cardeilhac objected to the portion of the instruction that stated, "If you do not agree on a verdict by 9:00 o'clock p.m., you may separate and return for further deliberations at 8:30 o'clock a.m. tomorrow." Cardeilhac's counsel argued that requiring the jury to deliberate until 9 p.m., rather than 5 p.m., put undue pressure on the jurors and would "force them into a decision because they are told they have to be here until nine o'clock, which is not typical business hours." The court stated that its practice was to give the jury the option of staying until 9 p.m., but that "if the jur[ors] tell[] me at 4:30 they have had a long day and they would like to separate, I have no problem with that either." The court overruled Cardeilhac's objection and gave the instruction as written.

After closing arguments, the case was submitted to the jury at 11:03 a.m. At approximately 7:30 p.m. that same day, the jury returned to the courtroom and delivered its verdict finding Cardeilhac guilty of second degree murder.

Cardeilhac thereafter filed a motion for a new trial. At the hearing on the motion, Cardeilhac contended that a new trial was required because of juror misconduct. In support of his allegations, Cardeilhac offered the affidavit of one of the jurors into evidence. In the affidavit, the juror stated, inter alia, that after approximately 6 hours of deliberation, she was the sole juror who wanted to convict Cardeilhac of manslaughter rather than second degree murder. She stated that some other jurors made statements trying to persuade her to change her vote and

that two of the jurors were "extremely belittling and belliger-
ent" to her. The juror stated the following:

> One female juror asked if she could show [A]ffiant what
> it would be like to [be] choked. Affiant agreed to this.
> While Affiant was sitting in a chair, the juror came up
> behind her and started to demonstrate on Affiant what it
> was like to be chocked [sic] from behind. The juror had
> her arm in front of [A]ffiant's throat and was blocking
> her air passage, but that choking did not cause her to
> panic. It was when the juror then pushed her chest against
> the back of Affiant's head, pushing it forward causing
> the pressure on the neck to increase that Affiant began
> to panic.

The juror stated that soon after this demonstration, she changed
her vote from manslaughter to second degree murder; the juror
stated, however, that she did not feel pressured to change her
vote. The juror also stated that she did not believe that what
she called the "re-enactment of the choking performed on her"
accurately conformed to the evidence presented in court, which
evidence included the video that showed Cardeilhac chok-
ing Baker.

The State objected to receipt of the affidavit into evidence
on the basis of Neb. Evid. R. 606, Neb. Rev. Stat. § 27-606
(Reissue 2008), which generally precludes a juror from testi-
fying as to matters or statements occurring during the course
of the jury's deliberations. Section 27-606, however, allows a
juror to "testify on the question whether extraneous prejudicial
information was improperly brought to the jury's attention or
whether any outside influence was improperly brought to bear
upon any juror."

The district court ruled that most of the juror's affidavit
was not admissible under § 27-606. The court stated that the
only portions of the affidavit that were possibly admissible
were those wherein the juror described the "re-enactment" of
the choking and where she later stated that she did not think
the "re-enactment" accurately conformed to the evidence. The

court concluded, however, that even those portions of the affidavit did not show by a preponderance of the evidence that extraneous prejudicial information had been considered by the jury. The court stated that the "re-enactment" was "not information that originated outside of the jury room or the record" and that instead it was "simply a critical examination of the evidence and nothing extraneous." The court stated that an evidentiary hearing was not necessary and overruled the motion for a new trial.

A sentencing hearing was conducted at which considerable evidence was received. Cardeilhac presented live testimony by two witnesses. The first witness was the mother of a friend of Cardeilhac; she testified regarding Cardeilhac's character and problems that he had had at home. The second witness was Dr. Kayla Pope, who was certified in child and adolescent psychiatry. Dr. Pope testified generally regarding differences in brain development and brain functioning between adults and adolescents and, as a result of her examination of Cardeilhac's treatment records and interviews, testified specifically regarding Cardeilhac's development and behavior.

Dr. Pope had talked with Cardeilhac, his mother, and his friend's mother, and so she testified regarding Cardeilhac's particular circumstances. Dr. Pope testified, inter alia, that Cardeilhac had "become much more emotionally reactive" after his parents divorced when he was 7 or 8 years old and that he suffered further trauma when he was placed into foster care after a finding of abuse and neglect. Dr. Pope opined that at the time he choked Baker, Cardeilhac was "only thinking in the moment" and "reacting to this impulsive need to get out of detention," and that he was "not thinking like a mature adult as to the consequences and whether this was a realistic plan." She also opined that because of his particular circumstances, Cardeilhac was "more susceptible to peer pressure than a normally developing adolescent," and that "there was a lot going on with other peers in the detention center and . . . he was affected by that." Dr. Pope speculated that

Cardeilhac's behavior and maturity would have developed by the time he reached age 25 or 30, but she acknowledged that she was not a forensic psychiatrist and that she did not do risk assessments.

After the parties presented their arguments at sentencing, and before it imposed sentence, the court stated, inter alia:

> In arriving at your sentence I have considered your age, your mentality, your education, your experience, your social and cultural background, your past criminal record, the motivation for your offense, and the amount of violence involved. I have also considered the testimony that I heard this afternoon as well.

In addition to the live testimony presented by Cardeilhac at the sentencing hearing, the court considered other evidence, including the presentence investigation report. The court set forth the reasoning behind its sentencing decision and stated that the crime for which Cardeilhac was convicted was "just a senseless act of violence" that resulted in a child losing a mother, parents losing a child, and a community losing one of its members. The court stated that in reviewing the record, it could not find an indication of remorse on Cardeilhac's part. Instead, the court stated the record showed that Cardeilhac's behavior in jail had been "rude, offensive, [and] noncompliant" and that Cardeilhac was "somebody who is very dangerous at this point in time and somebody that society needs protection from." The court acknowledged that the case was "also tragic . . . from [Cardeilhac's] standpoint," because his life had "gone very wrong very early."

The court sentenced Cardeilhac to imprisonment for not less than 60 years and not more than life. The court indicated that by virtue of the sentence imposed, Cardeilhac would "be eligible for parole at some point in time." The court ordered the sentence to be served consecutively to a sentence that Cardeilhac was serving for a separate robbery crime.

Cardeilhac appeals his conviction and sentence.

## ASSIGNMENTS OF ERROR

Cardeilhac claims, restated and reordered, that the district court erred when it instructed the jury that it would be required to deliberate until 9 p.m. before it could break for the night and when it overruled his motion for a new trial based on alleged juror misconduct. He also claims that the court imposed an excessive sentence, because the sentence did not comply with constitutional requirements for sentencing a juvenile.

## STANDARDS OF REVIEW

[1,2] Whether the jury instructions given by a trial court are correct is a question of law. *State v. Armagost*, 291 Neb. 117, 864 N.W.2d 417 (2015). When reviewing questions of law, an appellate court resolves the questions independently of the conclusion reached by the lower court. *Id*.

[3] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Ballew*, 291 Neb. 577, 867 N.W.2d 571 (2015).

[4] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015).

## ANALYSIS

*Court Did Not Err When It Instructed Jury That It*
*Would Be Required to Deliberate Until 9 p.m.*

Cardeilhac claims that the district court erred when it instructed the jury that it would be required to deliberate until 9 p.m. before it could break for the night. Cardeilhac argues that forcing the jurors to stay beyond normal business hours coerced them to come to a decision sooner than they might have had they been able to break at 5 p.m. and resume deliberations the next morning. We conclude that the instruction was not coercive and that the court did not err in giving it.

Cardeilhac cites to cases such as *State v. Garza*, 185 Neb. 445, 176 N.W.2d 664 (1970), and *State v. Floyd*, 272 Neb. 898, 725 N.W.2d 817 (2007), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727, in which deadlocked juries were directed to continue deliberating in ways that this court concluded unfairly prejudiced the defendant. In *Garza*, after over 15 hours of deliberation, the jury reported that it was deadlocked at 11 to 1; the trial court instructed the jury to continue deliberations. The trial court stated that the case should be disposed of by the jury and that the trial court could not be convinced there was no possibility the jury could not reach agreement. In *Garza*, we concluded that the trial court's admonition had the purpose of peremptorily directing an agreement and had "prevented the defendant from having his fate determined by an impartial and uncoerced jury." 185 Neb. at 449, 176 N.W.2d at 667.

In *Floyd*, a bailiff told the lone dissenting member of a jury that had been instructed by the court to continue deliberations that the court would "'"keep sending the jury back until you reach a unanimous decision."'" 272 Neb. at 905, 725 N.W.2d at 826. This court concluded that the bailiff's statement "could have pressured the average juror to change his or her vote in order to avoid protracted deliberations." *Id*. at 911, 725 N.W.2d at 830.

Cardeilhac contends that the court's instruction in this case had an effect similar to *Garza, supra*, because jurors knew that they would be required to stay until 9 p.m. if they had not reached a verdict sooner. We believe that Cardeilhac overstates the effect of this instruction. The instruction in the present case is significantly different from those in the cases relied upon by Cardeilhac both as to timing and content. The instruction was as follows: "If you do not agree on a verdict by 9:00 o'clock p.m., you may separate and return for further deliberations at 8:30 o'clock a.m. tomorrow." The instruction was given before the jury started deliberations as part of the instructions the court would routinely give to inform the

jury of how deliberations would proceed. Although the record indicates that at one point in the deliberations there was a juror who had not come to agreement with the other jurors, there is no indication that the jury ever reported to the court that it was deadlocked or that the court gave the instruction at issue as part of an admonition for the jury to continue deliberations. Considering the context in which it was given, it is unlikely that jurors would have taken the instruction as being coercive or as pressuring them to reach an agreement in order to avoid protracted deliberations.

Cardeilhac notes that in response to his objection to the instruction, the court stated that it would consider allowing the jury to break sooner if the jury so requested. He takes issue with the fact that the court did not revise the instruction and explicitly instruct the jury that the court would be willing to consider such a request. However, as the State notes, the court concluded the instruction regarding jury deliberations by setting forth the procedure by which the jury could submit written questions to the court through the bailiff. Therefore, had the jury wished to break from deliberations at an earlier hour, it was made aware that it had the ability to make such a request, but it did not do so.

The record shows that deliberations commenced at approximately 11 a.m. and that the jury returned its verdict at approximately 7:30 p.m. the same day. There is no indication that the jury expressed a desire to break at an earlier hour or any indication that it was pressured to reach agreement when it did.

We find no error in the district court's instruction, and we reject this assignment of error.

*Court Did Not Abuse Its Discretion When It*
*Overruled Motion for New Trial in Which*
*Cardeilhac Alleged Juror Misconduct.*

Cardeilhac claims that the district court erred when it overruled his motion for a new trial in which he claimed juror

misconduct. We determine that no juror misconduct was shown, and we therefore conclude that the district court did not abuse its discretion when it overruled Cardelihac's motion for a new trial.

Cardeilhac asserts that he should have been granted a new trial because jurors participated in a reenactment of the choking of Baker, which reenactment was not consistent with the evidence presented at trial. He contends that the reenactment violated the prohibition against bringing extraneous prejudicial material to the jury's attention and therefore constituted jury misconduct. The district court concluded, however, that Cardeilhac did not show by a preponderance of the evidence that extraneous prejudicial information had been considered by the jury, because the reenactment was "not information that originated outside of the jury room or the record" and instead it was "simply a critical examination of the evidence and nothing extraneous."

[5,6] A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial. *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015). We review the trial court's determinations of witness credibility and historical fact for clear error and review de novo the trial court's ultimate determination whether the defendant was prejudiced by juror misconduct. *Id*.

[7] We have held that when an allegation of jury misconduct is made and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent that the defendant was denied a fair trial. *Stricklin, supra*. If the trial court determines that the misconduct did not occur or that it was not prejudicial, adequate findings are to be made so that the determination may be reviewed. *Id*. Consistent with the

foregoing, in the present case, the district court determined that Cardeilhac had not made a showing that tended to prove that serious misconduct had occurred, and therefore the court did not hold an evidentiary hearing.

[8] Referring to the rules of evidence, we have further held that the duty to hold an evidentiary hearing with regard to allegations of jury misconduct does not extend to matters which are barred from inquiry under § 27-606(2). *Stricklin, supra*. Section 27-606(2) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

In the present case, Cardeilac offered the affidavit of a juror regarding, inter alia, the "re-enactment of the choking performed on her." The district court in this case properly refused to consider much of the juror's affidavit, because it was not admissible under § 27-606. The court considered only the portions of the affidavit that were possibly admissible as indicating that extraneous prejudicial information may have been improperly brought to the jury's attention. The portions of the affidavit considered by the court were those regarding the alleged reenactment of the choking, which Cardeilhac contends show that the jury considered extraneous prejudicial information, and a later portion regarding the juror's statement to the effect that she did not think the reenactment accurately conformed to the evidence.

We have said that the key phrase in § 27-606(2) is "extraneous prejudicial information" and that within this phrase, the crucial word is "extraneous," which means "'"existing or originating outside or beyond: external in origin: coming from the outside . . . brought in, introduced, or added from an external source or point of origin."'" *State v. Thomas*, 262 Neb. 985, 999, 637 N.W.2d 632, 650 (2002). In *Thomas*, we stated that when "[n]one of the jurors brought extraneous information to the jury or obtained extra information about the facts of the case," then extraneous prejudicial information was not brought to the jury's attention and we further noted that information provided by a member of the jury from his or her direct knowledge was not considered as coming from an external source. *Id*. at 1000, 637 N.W.2d at 650.

Reenactments or other exercises by which the jury tests the evidence presented at trial are generally considered appropriate jury conduct. It has been said:

It is not expected that jurors should leave their common sense and cognitive functions at the door before entering the jury room. Nor is it expected that jurors should not apply their own knowledge, experience, and perceptions acquired in the everyday affairs of life to reach a verdict. . . .

. . . .

Reenactments in the jury room based on the jury's recollection of the testimony are usually allowed as an application of the jury's common sense and deductive reasoning to determine the truth of the facts in dispute.

Bennett L. Gershman, *Contaminating the Verdict: The Problem of Juror Misconduct*, 50 S.D. L. Rev. 322, 331, 333 (2005). Cases from other jurisdictions are in accord. For example, in *State v. Balisok*, 123 Wash. 2d 114, 866 P.2d 631 (1994), jurors attempted to reenact a struggle between the defendant and the victim in order to test whether it could have happened in the manner described by the defendant, who claimed self-defense. The Supreme Court of Washington determined in

*Balisok* that the jurors' reenactment did not constitute extrinsic evidence, because it did not involve evidence outside of, or extrinsic to, the evidence that was presented at trial, and that the reenactment was "nothing more than a critical examination of [the defendant's] self-defense theory." 123 Wash. 2d at 120, 866 P.2d at 634. See, also, *State v. Pease*, 163 P.3d 985, 989 (Alaska App. 2007) ("[c]ourts have repeatedly upheld jurors' efforts to test the credibility or plausibility of trial testimony by . . . re-enacting the events or conditions described by witnesses").

We agree with the district court's determination that the reenactment in this case did not constitute extraneous prejudicial information. The choking demonstration in this case was part of the jury's critical examination of an aspect of the evidence. The juror stated in her affidavit that the other juror "asked if she could show affiant what it would be like to [be] choked" and that after the affiant-juror consented, the other juror demonstrated a choking from behind on the affiant-juror, because the evidence in the case was to the effect that Baker was choked from behind. The other juror did not bring any extraneous information to the jury, and it was not extra information about the facts of the case. There is no indication that the reenactment was seen by jurors as providing or generating new information directly related to the facts of this case; in fact, the affiant-juror stated that she did not think the reenactment was consistent with the evidence of how Baker was choked. Therefore, the reenactment was merely an exercise engaged in to critically examine the evidence.

We conclude that Cardeilhac did not show the existence of juror misconduct and that therefore, the district court did not err when it decided not to hold an evidentiary hearing. Because Cardeilhac did not show juror misconduct, the district court did not abuse its discretion when it overruled his motion for a new trial. We reject this assignment of error.

*Court Did Not Impose an Excessive Sentence.*

[9] Cardeilhac claims generally that the sentence of imprisonment for 60 years to life imposed by the district court was excessive. In contending that his sentence was excessive, Cardeilhac, who was 15 years old at the time of his crime, specifically claims that the sentencing process failed to comply with constitutional requirements for sentencing juveniles set forth in *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), and that this court should therefore vacate his sentence. "In *Miller v. Alabama*, [*supra*], the Court held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing." *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 725, 193 L. Ed. 2d 599 (2016). Although Cardeilhac acknowledges that he was not sentenced to life in prison without the possibility of parole, he nevertheless urges us to adopt and apply the sentencing process announced in *Miller* to lengthy term-of-years sentences imposed on juveniles. For several reasons, including the fact that Cardeilhac had the full benefit of the individualized sentence decisionmaking prescribed by *Miller*, it is unnecessary for us to decide the extent of the cases to which the *Miller* sentencing principles apply and we affirm Cardeilhac's sentence.

Cardeilhac was convicted of second degree murder, which is a Class IB felony under Neb. Rev. Stat. § 28-304(2) (Reissue 2008). The penalty for a Class IB felony is imprisonment for a minimum of 20 years and a maximum of life. Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2014). Cardeilhac's sentence of imprisonment for 60 years to life is therefore within statutory limits.

[10] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as

any applicable legal principles in determining the sentence to be imposed. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015). With regard to the relevant factors that must customarily be considered and applied, we have stated that when imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *Id.*

We note in this case that the court in fact considered each of these factors and so stated at the sentencing hearing. The court further set forth its reasoning for the sentence it imposed. The court emphasized the senselessness of the act of violence, the effect it had on others, and the perceived lack of remorse on Cardeilhac's part. The court noted that Cardeilhac was shown to be dangerous and that society needed to be protected from such dangerousness. The court also indicated that it had considered the mitigating factors presented by Cardeilhac's evidence related to his status as a person under age 18, including the evidence that Cardeilhac's life had "gone very wrong very early."

Having reviewed the record and the evidence considered by the court at sentencing, we cannot say that the sentence imposed was an abuse of discretion under the standards set forth above. However, Cardeilhac contends that because he was a juvenile, additional legal principles are applicable in this case, and that such additional principles are constitutional in nature as set forth by the U.S. Supreme Court in *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Thus, Cardeilhac contends we should vacate his sentence and remand his cause for a hearing consistent with *Miller*.

In *Miller, supra*, the Court held that mandatory sentences of life imprisonment without parole for those under age 18

at the time they committed homicides violates the Eighth Amendment's prohibition on cruel and unusual punishment. As we recognized in *State v. Mantich*, 287 Neb. 320, 339-40, 842 N.W.2d 716, 730 (2014), *Miller* did not "categorically bar" the imposition of a sentence of life imprisonment without parole but instead "held that a sentencer must consider specific, individualized factors before handing down a sentence of life imprisonment without parole for a juvenile." The U.S. Supreme Court stated in *Miller* that "we do not foreclose a sentencer's ability to make that judgment [of life imprisonment without parole] in homicide cases, [however] we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 132 S. Ct. at 2469.

As we noted in *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014), in response to *Miller*, the Nebraska Legislature enacted Neb. Rev. Stat. § 28-105.02 (Cum. Supp. 2014), regarding sentencing for certain murderers convicted of crimes classified as Class IA felonies. Section 28-105.02 provides:

> (1) Notwithstanding any other provision of law, the penalty for any person convicted of a Class IA felony for an offense committed when such person was under the age of eighteen years shall be a maximum sentence of not greater than life imprisonment and a minimum sentence of not less than forty years' imprisonment.

> (2) In determining the sentence of a convicted person under subsection (1) of this section, the court shall consider mitigating factors which led to the commission of the offense. The convicted person may submit mitigating factors to the court, including, but not limited to:

> (a) The convicted person's age at the time of the offense;

> (b) The impetuosity of the convicted person;

> (c) The convicted person's family and community environment;

(d) The convicted person's ability to appreciate the risks and consequences of the conduct;

(e) The convicted person's intellectual capacity; and

(f) The outcome of a comprehensive mental health evaluation of the convicted person conducted by an adolescent mental health professional licensed in this state. The evaluation shall include, but not be limited to, interviews with the convicted person's family in order to learn about the convicted person's prenatal history, developmental history, medical history, substance abuse treatment history, if any, social history, and psychological history.

Section 28-105.02 applies specifically to sentences for Class IA felonies, and therefore by its terms, does not apply to the present sentence resulting from Cardeilhac's conviction for second degree murder, a Class IB felony. Arguably, because a person convicted of a Class IB felony could be sentenced to imprisonment for a term of life to life, the Legislature might have chosen to require a court to consider the mitigating factors listed in § 28-105.02(2) when sentencing a juvenile for a Class IB felony, as well as for a Class IA felony. However, the Legislature did not so provide and therefore the district court could not have violated § 28-105.02 by failing to consider such specific statutory factors in sentencing Cardeilhac in this Class IB felony case.

Although consideration of the statutory factors in § 28-105.02 was not required, Cardeilhac nevertheless argues that because a juvenile convicted of a Class IB felony can be sentenced to life imprisonment, *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), requires a sentencing court to consider the factors set forth in § 28-105.02 before it sentences a juvenile for a Class IB felony. Because the court in this case did not explicitly state it was following the factors listed in § 28-105.02, Cardeilhac contends that *Miller* juvenile sentencing principles dictate that his sentence be vacated. We reject this argument for several reasons, including the fact that

Cardeilhac was not sentenced to life imprisonment without parole, and in any event, he received the full benefit of *Miller* juvenile sentencing principles.

We note first that unlike the focus of *Miller, supra*, i.e., mandatory life in prison without parole, Cardeilhac was not in fact sentenced to imprisonment for life without the possibility of parole. Instead, Cardeilhac was sentenced to imprisonment for a minimum of 60 years to life to be served consecutively to an 8- to 15-year sentence in a separate robbery case that he was already serving. Therefore, he will be eligible for parole as the district court noted at sentencing. See Neb. Rev. Stat. § 83-1,110(1) (Reissue 2014) ("[e]very committed offender shall be eligible for parole when the offender has served one-half the minimum term of his or her sentence"). Cf. *State v. Castaneda*, 287 Neb. 289, 842 N.W.2d 740 (2014) (offender sentenced to minimum of life imprisonment is not eligible for parole). Strictly read, *Miller* forbids only the imposition of a mandatory sentence of life imprisonment without parole on a person under age 18 who has committed a homicide. And according to the U.S. Supreme Court in its recent opinion, "[a] state may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 736, 193 L. Ed. 2d 599 (2016) (citing approvingly of Wyoming legislation providing that juvenile offenders sentenced to life imprisonment are eligible for parole after 25 years (Wyo. Stat. Ann. § 6-10-301(c) (2013))). Because the sentence imposed on Cardeilhac allows him to be considered for parole, *Miller* would not be offended on this basis.

We are aware that other courts have discussed whether the sentencing principles of *Miller, supra*, apply when a juvenile is not sentenced to life imprisonment but instead is sentenced to a term of years that is lengthy or, when aggregated with other sentences, the term of imprisonment is so long that the defendant will have effectively served a term of life

imprisonment before he or she is eligible for parole. Such opinions tend to note that the Court's decision in *Miller* was based in part on *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), which generally held that life imprisonment without the possibility of parole for juveniles convicted of nonhomicide offenses was unconstitutional. In particular, *Graham* stated that such juveniles must be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 75. Even though the U.S. Supreme Court has not addressed whether imprisonment for a lengthy term of years triggers *Miller* sentencing principles, these courts have reasoned that a meaningful opportunity to obtain release requires that a lengthy term of years be considered the equivalent of a life sentence and that *Miller* sentencing protections relating to life sentences for juveniles apply to such lengthy terms of imprisonment. See, e.g., *Casiano v. Commissioner of Correction*, 317 Conn. 52, 115 A.3d 1031 (2015); *State v. Null*, 836 N.W.2d 41 (Iowa 2013); *Bear Cloud v. State*, 334 P.3d 132 (Wyo. 2014). Other courts have decided that at some point, a term of years might become the equivalent of imprisonment for life or life without parole and reduced the sentence on appeal. See *Brown v. State*, 10 N.E.3d 1 (Ind. 2014) (ruling that 150-year aggregate sentence for two counts of murder and one count of robbery is similar to life without parole, Supreme Court of Indiana reduced sentence to 80 years).

Other courts have found that even a lengthy term of years is not the equivalent of a life sentence if parole is possible within the defendant's expected lifetime. In *State v. Zuber*, 442 N.J. Super. 611, 126 A.3d 335 (2015), the Superior Court of New Jersey considered the case of a defendant who was serving consecutive sentences for numerous offenses arising out of two incidents when he was a juvenile. Although the sentences of imprisonment totaled 110 years, the defendant would be eligible for parole in 55 years. The court in *Zuber* assumed without deciding that the principles of

*Graham* could apply to the defendant's total aggregated sentences. The court concluded that because the defendant's predicted lifespan exceeded his parole eligibility date, the defendant had a meaningful and realistic opportunity to obtain release, and that therefore, the sentence was not de facto a life sentence.

The court in *Zuber, supra*, specifically disagreed with *Null, supra*, and *Bear Cloud, supra*, and what it characterized as the holdings in those cases to the effect that a defendant's "'geriatric release'" was sufficient to trigger the protections of *Graham, supra*, and *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The court in *Zuber* also disagreed with what it characterized as the holding in *Casiano, supra*, that *Graham* required that a defendant have an opportunity for a meaningful life outside of prison in which to engage in a career or to raise a family. See, also, *Thomas v. State*, 78 So. 3d 644 (Fla. App. 2011) (deciding under *Graham*, that while at some point term-of-years sentence may become functional equivalent of life, 50-year sentence is not functional equivalent). The *Zuber* opinion is consistent with the recent case of *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 737, 193 L. Ed. 2d 599 (2016), in which the Court characterized the period after release on parole not in terms of the quality of life but of consisting merely of "some years of life outside prison walls."

The foregoing and similar cases are concerned initially with whether the nature of the sentence imposed triggers *Graham* and *Miller* juvenile sentencing protections such that the sentences should be vacated and the causes remanded for sentencing hearings consistent with *Miller*. In this case, we need not decide whether *Miller* applies to a sentence having a minimum other than life imprisonment or, if it does, whether the minimum sentence here is of such a nature or length that the *Miller* protections of individualized sentencing apply and require an order of remand, because the sentencing hearing in this case did in fact comply with *Miller* principles.

Considerable evidence was offered at the sentencing hearing regarding Cardeilhac's life, maturity, abilities, history, and environment. At the sentencing, in addition to stating that it considered the usual factors, including the defendant's age, maturity, experience, and background, the court stated that it considered the testimony it heard at the sentencing hearing. Such testimony included two witnesses presented by Cardeilhac. The first was the mother of a friend of Cardeilhac who testified regarding Cardeilhac's character and problems that he had had at home. In addition, Cardeilhac called Dr. Pope, specifically as a witness regarding sentencing. Dr. Pope was certified in child and adolescent psychiatry. Dr. Pope's testimony included general testimony regarding differences in brain development and brain functioning between adults and adolescents as well as specific observations about Cardeilhac based on her review of his records and interviews with Cardeilhac, his mother, and his friend's mother. Dr. Pope testified regarding Cardeilhac's particular circumstances. Her testimony incorporated the features of a *Miller* sentencing hearing.

Although, as we noted above, the court was not required to follow § 28-105.02(2), because, by its terms, the statute applies to Class IA felonies and Cardeilhac was sentenced for a Class IB felony, the testimony presented by Cardeilhac at sentencing covered numerous factors set forth in § 28-105.02(2). Such evidence related to, inter alia, Cardeilhac's age, impetuosity, family and community environment, and ability to appreciate risks. Therefore, although the court did not explicitly state that it considered the factors set forth in § 28-105.02(2), it did consider evidence which addressed those statutory factors. In addition, the sentencing decision comported with the principles and purposes of juvenile sentencing and the process prescribed in *Miller, supra*, which directs the sentencing court to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," 132 S. Ct. at 2469. Therefore, although

we need not decide whether *Miller* applies, we determine that the court in this case did in fact take into account the considerations required by *Miller* before it sentenced Cardeilhac. Cardeilhac's assignment of error challenging his sentence is without merit.

## CONCLUSION

Having rejected Cardeilhac's assignments of error, we affirm his conviction for second degree murder and the sentence of imprisonment of 60 years to life.

AFFIRMED.

McCORMACK and STACY, JJ., not participating.