Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/23/2018 09:14 AM CST

STATE OF NEBRASKA, APPELLEE, V.
DOMINIQUE HAIRSTON, APPELLANT.
___ N.W.2d ___

Filed December 1, 2017.    No. S-16-965.

1. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

2. **Criminal Law: Juror Misconduct: Proof.** A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.

3. **Juror Misconduct: Proof: Appeal and Error.** When an allegation of jury misconduct is made and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent that the defendant was denied a fair trial. If the trial court determines that the misconduct did not occur or that it was not prejudicial, adequate findings are to be made so that the determination may be reviewed.

4. **Prosecuting Attorneys: Appeal and Error.** When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct.

5. **Prosecuting Attorneys: Witnesses: Perjury.** It is not improper per se for a prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

William J. O'Brien for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Miller-Lerman, J.
## NATURE OF CASE
Dominique Hairston appeals his convictions in the district court for Douglas County for unlawful discharge of a firearm and use of a weapon to commit a felony. Hairston claims the district court erred when it denied him a new trial based on his allegations of juror misconduct and prosecutorial misconduct. We reject Hairston's claims and affirm his convictions.

## STATEMENT OF FACTS
On July 30, 2015, police officers responded to reports of a shooting in the area of South 33d and Q Streets in Omaha, Nebraska. Police found a dark blue Oldsmobile parked near a convenience store on Q Street. Police learned that shots had been fired into the Oldsmobile from another vehicle that was passing it in an adjacent lane. Four adults and two children had been inside the Oldsmobile at the time, and one of the adult occupants was injured by a gunshot to the neck. Police found another vehicle, a silver Saturn, stopped a short distance away on South 33d Avenue; it appeared that the Saturn had been disabled after it struck the curb of a storm drain after turning onto South 33d Avenue from Q Street. Witnesses stated that three men had run from the Saturn after it stopped.

The registered owner of the Saturn was Lafferrell Matthews. Officers investigating the shooting found Matthews in the area near South 33d and S Streets. When the officers approached Matthews, he told them he had been looking for police in order to report that his car had been stolen. In later questioning by police, Matthews initially repeated that his car had been stolen

but he eventually admitted that he was driving the Saturn at the time the shooting occurred. Matthews further told police that Hairston and another man, Nico Wofford, were passengers in the Saturn.

Hairston and Wofford were each charged with unlawful discharge of a firearm and use of a weapon to commit a felony, and the two were tried in a consolidated trial. Matthews, who was charged with the same offenses but whose case was not consolidated with the others, testified at Hairston and Wofford's consolidated trial.

Matthews testified that on July 30, 2015, he was driving his Saturn and Hairston and Wofford were passengers, with Hairston in the front passenger seat and Wofford in the back seat on the passenger side. Matthews first noticed the Oldsmobile in front of his Saturn when he was stopped at a light at the intersection of South 30th and Q Streets. Matthews testified that Hairston said that he recognized the Oldsmobile. After going through the intersection of South 30th and Q Streets, Matthews moved into the left lane to pass the Oldsmobile, which was in the right lane. As he was passing the Oldsmobile, Matthews heard three or four shots coming from the back seat of his Saturn, where Wofford was located. Matthews testified that he then saw Hairston pull out a handgun, lean out the window, and fire six or seven shots.

The State presented other evidence, including, inter alia, testimony by various police officers who had investigated the shooting. During the testimony of one of the officers, the State offered into evidence a DVD containing a surveillance camera video that was taken from a restaurant located near the site of the shooting. The video depicted the Saturn passing the Oldsmobile as the shooting occurred. The State also offered a DVD containing a redacted version of the video in which the image was slowed down and enlarged. Both DVD's offered by the State were received into evidence without objection, and they were played for the jury while the State questioned the officer regarding what was being depicted in the videos.

Hairston testified in his own defense as follows: On July 30, 2015, Hairston rode with Matthews in Matthews' car; the purpose of their trip was for Hairston to pick up marijuana at a location on South 30th Street. Matthews dropped Hairston off near the corner of South 29th and S Streets, and Hairston then walked to the location, where he purchased marijuana. Hairston returned to the spot where Matthews had dropped him off, but Matthews was no longer there. After a few minutes, Hairston decided that because Matthews had not returned, he would walk home. On the way, Hairston saw a friend, Kayla Cash, driving by; he waved her down, and she gave him a ride the rest of the way. Hairston testified that on July 30, he did not ride in Matthews' car with both Matthews and Wofford, he did not shoot at another vehicle from Matthews' car, and he did not shoot a gun at all that day.

Hairston attempted to call Cash as a witness in his defense, but Cash invoked her Fifth Amendment right to remain silent. Cash had a pending charge of accessory to a felony related to Hairston's and Wofford's cases, and she invoked her Fifth Amendment rights upon the advice of her attorney.

The case was submitted to the jury, and the jury rendered verdicts finding Hairston guilty on both counts. After the jury was dismissed, Wofford's counsel was approached by a juror who told him that during deliberations, jurors had viewed a "mirror-image" of the surveillance video that had been played in court. Wofford's counsel later spoke with the jury foreperson, who said that he and another juror had used a feature on the laptop computer that had been provided to the jury to play a reversed or mirror image of the surveillance video. The foreperson further said that after viewing the mirror image, the two had called over other jurors to view the mirror image. The foreperson and another juror told counsel that when they viewed the mirror image, they could see an arm coming out of the back seat window of the vehicle and a front seat passenger in a white shirt and that they had not noticed these things when they had viewed the video in the original manner.

Hairston thereafter filed a motion for a new trial in which he alleged three bases for a new trial. First, he alleged that there was prosecutorial misconduct because Cash had told Hairston's counsel that before she decided to invoke her Fifth Amendment right to remain silent, the prosecutor told her that if she testified in Hairston's defense, she could be prosecuted for perjury. Hairston argued that the prosecutor's statement caused Cash to refuse to testify. Second, Hairston alleged that there was an irregularity in the proceedings, because during deliberations, the court provided the jury with a laptop device—rather than a television as requested by the jury—which allowed the jury to view a mirror image of the surveillance video. Finally, Hairston alleged that that there was juror misconduct because jurors viewed a mirror image of the surveillance video; he argued that the mirror image was extraneous prejudicial information.

Hairston attached to his motion for a new trial an affidavit of Wofford's attorney, and attached to the affidavit were transcriptions of that attorney's conversations with two jurors. Hairston also attached an affidavit of his own attorney regarding his attorney's conversation with Cash. At a hearing on the motion for a new trial, the district court received the attachments for the sole purpose of deciding the motion. After hearing argument by both parties, the court stated, with regard to the alleged juror misconduct, that "the evidence that went in was a video, and that . . . video wasn't changed, altered, manipulated as far as changing the picture, . . . what it showed, what it was capable of showing." The court determined that there was not "any extraneous, prejudicial information that went in or any . . . outside influence." With regard to the alleged prosecutorial misconduct, the court stated that it did not see any evidence that the prosecutor had "somehow influenced this witness to take her Fifth Amendment." The court therefore overruled Hairston's motion for a new trial and denied his request for an evidentiary hearing.

The court thereafter sentenced Hairston to imprisonment for 20 to 30 years for unlawful discharge of a firearm and 20 to 30 years for use of a weapon to commit a felony. The court ordered the two sentences to be run consecutively to one another.

Hairston appeals his convictions.

## ASSIGNMENTS OF ERROR

Hairston claims that the district court erred when it overruled his motion for a new trial and rejected his allegations of (1) juror misconduct relating to jurors' viewing a mirror image of the surveillance video and (2) prosecutorial misconduct relating to the prosecutor's comments to Cash regarding her potential testimony in Hairston's defense. Hairston further claims that the court erred when it denied his request for an evidentiary hearing to further develop his allegations of juror misconduct and prosecutorial misconduct.

## STANDARDS OF REVIEW

[1] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Hoerle*, 297 Neb. 840, 901 N.W.2d 327 (2017).

## ANALYSIS

*Alleged Juror Misconduct: Jurors' Viewing of*
*Reversed Image of Surveillance Video Did*
*Not Expose Jurors to Extraneous*
*Prejudicial Information.*

Hairston first claims that the district court erred when it overruled his motion for a new trial based on his allegation of juror misconduct related to the viewing of a reversed image of the surveillance video. He also claims that the court erred when it denied an evidentiary hearing to develop the allegation. We determine that Hairston's allegation did not show serious

juror misconduct, and we therefore conclude that the district court did not err when it determined that his allegations did not warrant an evidentiary hearing and did not abuse its discretion when it overruled his motion for a new trial based on the allegation.

[2,3] A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial. *State v. Cardeilhac*, 293 Neb. 200, 876 N.W.2d 876 (2016). We have held that when an allegation of jury misconduct is made and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent that the defendant was denied a fair trial. *Id*. If the trial court determines that the misconduct did not occur or that it was not prejudicial, adequate findings are to be made so that the determination may be reviewed. *Id*.

In the present case, after hearing argument on Hairston's motion for a new trial, the district court considered Hairston's allegations, motion, and attachments, and it determined that the jurors' use of the computer to display a reversed image did not change the evidence and did not constitute extraneous prejudicial information. The court therefore effectively determined that Hairston had not made a showing that tended to prove that serious juror misconduct had occurred and that an evidentiary hearing was not necessary.

We express no opinion whether the district court properly considered Hairston's allegations regarding jurors' statements to the extent such consideration was allowed under Neb. Rev. Stat. § 27-606(2) (Reissue 2016). Section 27-606(2) generally provides that in connection with an inquiry into the validity of a verdict, a juror may not testify as to anything that occurred during deliberations or as to the effect anything had

on the juror's decision. Section 27-606(2), however, allows a juror to testify "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Hairston offered the affidavit of Wofford's attorney regarding jurors' statements to the effect that they had used the laptop computer to view a reversed image of the surveillance video. The State in this appeal does not dispute that the court could consider these allegations to the extent they may indicate that extraneous prejudicial information may have been brought to the jury's attention.

We have stated that in the context of § 27-606(2), "extraneous," in the phrase "extraneous prejudicial information," means "'"'existing or originating outside or beyond: external in origin: coming from the outside . . . brought in, introduced, or added from an external source or point of origin.'"'" *Cardeilhac*, 293 Neb. at 212, 876 N.W.2d at 884, quoting *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002). In *Thomas*, we stated that when "[n]one of the jurors brought extraneous information to the jury or obtained extra information about the facts of the case," then extraneous prejudicial information was not brought to the jury's attention. 262 Neb. at 1000, 637 N.W.2d at 650.

The items at issue consisted of two DVD exhibits, one of which contained the surveillance video and the other of which contained a redacted version of the video which was slowed down and enlarged. The DVD's had been received into evidence without objection and were published to the jury in court. Although Wofford objected to allowing the redacted DVD to be provided to the jury during deliberations, the court overruled the objection and Hairston did not join in Wofford's objection.

Hairston argues that he should have been granted a new trial because jurors' manipulation of the video image using the laptop computer resulted in the jury's being exposed to extraneous prejudicial information. He asserts that the computer's

software allowed the jury to view the surveillance video in a way which was different from how it had been presented in court and that therefore the jury was allowed to rely on evidence that was not presented in court.

We reject Hairston's argument and instead agree with the district court's determination that the jurors' viewing of a reversed image of the surveillance video in this case did not constitute extraneous prejudicial information. Although the computer software allowed the jurors to view the video from a perspective which differed from its presentation in court, and although the jurors may have noticed things in the video that they had not previously noticed, there is nothing in Hairston's allegations that indicates that such viewing altered or augmented the fixed content of the DVD's in any manner that would constitute evidence extraneous to what had been received into evidence. The undisputed record does not suggest this jury engaged in misconduct.

Our reasoning is consistent with other authorities. In *People v. Collins*, 49 Cal. 4th 175, 232 P.3d 32, 110 Cal. Rptr. 3d 384 (2010), the Supreme Court of California rejected an argument that a juror had been exposed to extraneous prejudicial information when the juror used his personal computer to diagram events at issue in the case. The court in *Collins* reasoned that the juror's use of the computer was "simply his own permissible thinking about the evidence received, and was not an experiment resulting in the acquisition of any new facts." 49 Cal. 4th at 252, 232 P.3d at 91, 110 Cal. Rptr. 3d at 454. The court noted that the juror had relied on evidence in the record to create his diagram. The court stated:

> The computer did not create evidence that was not already before [the juror]. The computer was simply the device that allowed [the juror] to draw his diagram with ease and accuracy in order to visualize the evidence. There was no showing that the computer or its software performed any analytical function or provided any outside information.

*Id*. at 255, 232 P.3d at 93, 110 Cal. Rptr. 3d at 457. The court in *Collins* cautioned that a computer could be used to investigate a case, "[i]f, for example, a juror conducts an investigation in which he or she relies on software that manipulates the data, subjecting it to presumptions written into the program, such use would likely constitute an improper experiment." 49 Cal. 4th at 256, 232 P.3d at 93, 110 Cal. Rptr. 3d at 457. The court in *Collins* concluded, however, that the juror's use of the computer in that case was part of the juror's critical examination of the admitted evidence rather than an investigation that created new evidence.

In *People v. Turner*, 22 Cal. App. 3d 174, 99 Cal. Rptr. 186 (1971), the court rejected an argument that the jury had conducted an improper experiment that introduced new evidence when the jury used a magnifying glass to examine a photograph. The court reasoned that the jury was merely making a more critical examination of the evidence than was made at trial and that "[a]t most, the use of the magnifying glass involved an extension of the jury's sense of sight . . . ." *Id.* at 183, 99 Cal. Rptr. at 191.

Similar to the reasoning in these cases, we determine that the jurors' use of the computer in this case to view a reversed image of the surveillance video did not expose the jury to extraneous information but instead allowed them to make a more critical examination of an exhibit that had been admitted into evidence. There is no indication that the computer was used to manipulate the video in a manner that altered or augmented what was already contained on the DVD and therefore no indication that new information was introduced. Instead, similar to the magnifying glass in *Turner*, the computer in this case was a tool that operated as an extension of the jurors' sense of sight and allowed them to critically examine evidence that had been admitted in the trial.

Because Hairston did not make a showing which tended to prove that serious juror misconduct occurred, there was no need to conduct an evidentiary hearing to determine whether

the alleged misconduct actually occurred and, if so, whether it was prejudicial to the extent Hairston was denied a fair trial. We therefore conclude that the district court did not err when it denied Hairston an evidentiary hearing on the issue and when it overruled Hairston's motion for a new trial based on his allegation of juror misconduct. We reject this assignment of error.

*Alleged Prosecutorial Misconduct: Prosecutor's
Alleged Comment Regarding Potential Perjury
Charge Was Not Threat or Intimidation.*

Hairston next claims that the district court erred when it overruled his motion for a new trial without an evidentiary hearing, based on his allegation of prosecutorial misconduct related to Cash's decision not to testify in Hairston's defense. We determine that Hairston's allegations did not show prosecutorial misconduct, and we therefore conclude that the district court did not err when it determined that his allegations did not warrant an evidentiary hearing and did not abuse its discretion when it overruled his motion for a new trial based on this allegation.

[4] When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct. *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016). Hairston argues that the prosecutor's comments to Cash constituted misconduct because the comments put her under such duress that she was unable to make a clear and free choice whether to testify in Hairston's defense. Hairston relies in large part on *State v. Ammons*, 208 Neb. 797, 305 N.W.2d 808 (1981), in which we concluded that there was prosecutorial misconduct when the prosecution intimidated a witness for the defense and caused him to refuse to testify.

We reasoned in *Ammons* that the "constitutional [due process] right of a defendant to call witnesses in his defense mandates that they must be called without intimidation." 208 Neb. at 801, 305 N.W.2d at 811. In *Ammons*, the potential defense

witness had pled guilty to a separate charge pursuant to a plea agreement in which the prosecutor agreed to not bring charges against the witness for the robbery for which the defendant was being tried. At a hearing in which the witness ultimately decided to assert his Fifth Amendment rights and not testify for the defense, the prosecutor "stated for the record that the State would prosecute" the witness for the burglary if the witness testified in the *Ammons* case; the prosecutor stated that "any agreement the prosecutor in [the witness'] case made was 'out the window' if [the witness] took the stand in the present case and testified in open court that he committed the robbery." 208 Neb. at 800, 305 N.W.2d at 810. We concluded that the record in *Ammons* was "clear that the prosecutor's threat to [the witness] caused [the witness] to refuse to testify and resulted in depriving the defendant of that testimony." 208 Neb. at 803, 305 N.W.2d at 812.

One justice dissented without opinion in *Ammons*. Two other justices concurred in the result on the sole basis that "the State failed to honor . . . an enforceable plea bargain"; the concurring justices "[did] not want to suggest that a judge or prosecutor who warns a witness of the possibility of self-incrimination or of the penalties for perjury has engaged in witness intimidation." *Id*.

[5] The Court of Appeals for the Eighth Circuit in *United States v. Risken*, 788 F.2d 1361 (8th Cir. 1986) made a distinction similar to that made by the concurring justices in *Ammons*. The Court of Appeals stated:

> "It is not improper *per se* for a . . . prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely. But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify." *United States v. Blackwell*, 224 U.S.App.D.C. 350, 694 F.2d 1325, 1334 (1982) (citations omitted). The prosecutor's statements in the present case do not approximate the sort of governmental misconduct held

unconstitutional in the leading case of *Webb v. Texas*, 409 U.S. 95, 98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330 (1972) (per curiam), in which the trial court gratuitously and at great length admonished only the defendant's single witness not to lie and warned him of the dire consequences of perjury, or in *United States v. Smith*, 156 U.S.App.D.C. 66, 478 F.2d 976, 979 (1973), in which the prosecutor threatened to prosecute the prospective witness for *past* crimes if he took the stand and testified in a pending trial. Rather, the prosecutor's statements in the present case constituted a constitutionally permissible "mere warning" about the dangers of committing perjury. *See, e.g., United States v. Blackwell*, 694 F.2d at 1335; *United States v. Simmons*, 216 U.S.App.D.C. 207, 670 F.2d 365, 371 (1982) (per curiam); *cf. United States v. Harlin*, 539 F.2d 679, 681 (9th Cir.) (trial judge's warning), *cert. denied*, 429 U.S. 942, 97 S.Ct. 362, 50 L.Ed.2d 313 (1976). The prosecutor told [the potential witness] about the serious consequences of perjury, including the possibility of prosecution and the range of punishment. The prosecutor's remarks here were limited to warning [the potential witness] about the serious consequences of perjury in the context of [the potential witness'] testimony in this case; the prosecutor did not threaten to prosecute [the potential witness] for other crimes or to retaliate against him if he testified truthfully. *See United States v. Blackwell*, 694 F.2d at 1334 (citing cases involving threats of prosecution for other crimes, reindictment on dropped charges, revocation of probation).

We note, however, that prosecuting attorneys should exercise considerable restraint when advising potential witnesses about the consequences of committing perjury.

*Risken*, 788 F.2d at 1370-71.

In the present case, Hairston attached to his motion for a new trial the affidavit of his attorney, who stated Cash told him that the prosecutor "had admonished her that if she

testified in defense of . . . Hairston, she could be prosecuted for perjury." Hairston's attorney further stated in his affidavit that when he attempted to call Cash as a witness in Hairston's defense, "Cash stated in chambers before the trial judge and on the record that she would refuse to testify based on the advice of her attorney." Hairston's attorney further stated that Cash's attorney had told him that "he was advising . . . Cash not to speak with affiant and not to sign any affidavit regarding what [the prosecutor] may have said to her."

Hairston's allegations of prosecutorial misconduct therefore were merely that the prosecutor had "admonished" Cash of the potential penalties for perjury. Although Cash refused to testify in Hairston's defense, there was no indication that her decision was the result of any threat or intimidation by the prosecutor. Hairston made no allegation that the prosecutor's statement went beyond an accurate statement regarding potential penalties for perjury, and he made no allegation that the prosecutor threatened to prosecute her for some other crime if she testified truthfully in Hairston's trial. Instead, Hairston's attorney's affidavit indicates that Cash chose not to testify based on the advice of her attorney. We note that in an in camera hearing after Hairston attempted to call Cash as a witness, Cash stated to the court that she was invoking her Fifth Amendment rights on the advice of her counsel.

We conclude that Hairston's allegations did not show an improper threat or intimidation by the prosecutor; instead, it appears that the prosecutor advised Cash regarding the penalties for perjury and that Cash made her decision not to testify after consulting with her attorney. Because Hairston's allegations did not show that the prosecutor improperly threatened or intimidated Cash to prevent her testimony, we conclude that the court did not err when it denied an evidentiary hearing on the issue and that it did not abuse its discretion when it overruled Hairston's motion for a new trial based on the allegation of prosecutorial misconduct. We reject this assignment of error.

## CONCLUSION

We conclude that the district court did not err when it denied an evidentiary hearing on Hairston's allegations of juror misconduct and prosecutorial misconduct and that it did not abuse its discretion when it overruled Hairston's motion for a new trial on such bases. We therefore affirm Hairston's convictions.

AFFIRMED.

WRIGHT, J., not participating in the decision.