Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/30/2016 09:10 AM CST

State of Nebraska, appellee, v.
Christopher M. Garza, appellant.
___ N.W.2d ___

Filed December 30, 2016.    No. S-16-231.

1. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reason or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Juvenile Courts: Sentences.** Under *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), a juvenile defendant may be sentenced to life imprisonment without parole, so it is immaterial whether the sentence imposed is a de facto life sentence.
4. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.
5. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.
6. **Homicide: Sentences: Minors: Aggravating and Mitigating Circumstances.** Neb. Rev. Stat. § 28-105.02(2) (Reissue 2016) contains a nonexhaustive list of mitigating factors a sentencing court must consider when imposing a sentence for first degree murder on one who was under the age of 18 when he or she committed the crime.

7. **Sentences.** In considering a sentence, the sentencing court is not limited in its discretion to any mathematically applied set of factors. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Douglas County: Marlon A. Polk, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Annie O. Hayden for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Stacy, J.

## INTRODUCTION

In 1991, Christopher M. Garza was convicted of first degree murder and use of a firearm during the commission of a felony. He was sentenced to life imprisonment on the murder conviction and was given a consecutive sentence of 6⅔ to 20 years' imprisonment on the use conviction.

In 2015, Garza was granted postconviction relief as a result of the U.S. Supreme Court's decision in *Miller v. Alabama.*[1] He was resentenced on the murder conviction to a term of 90 to 90 years' imprisonment. He appeals this sentence as excessive. We affirm.

## BACKGROUND

After a jury trial, Garza was convicted of first degree murder and use of a weapon to commit a felony. We affirmed

---

[1] *Miller v. Alabama*, ___ U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

Garza's convictions on direct appeal.[2] In our 1992 opinion, we summarized the evidence of Garza's crimes:

When she was killed on March 21, 1990, the victim, Christina O'Day, was a 17-year-old high school senior. Garza, having been born [i]n May . . . 1973, was then 16 years old, and Wayne K. Brewer, the other individual involved, see *State v. Brewer*[, 241 Neb.] 24, 486 N.W.2d 477 (1992), was then 18 years old.

Beginning in March 1989, the victim's employer started working the night shift and thus arranged for the victim to spend the night at her house to take care of her 8-year-old daughter. The victim would drive to the employer's house between 10:45 and 11:10 p.m. and park her automobile in the garage; the employer would then go to work. On Mondays, the employer usually attended a university class from 7 to 9:45 p.m. and would go to work directly from the university.

Garza had met Brewer in February 1990 at a local fast-food restaurant where they both worked. Shortly thereafter, the two became friends and began to do things together on a regular basis.

Garza claimed that on Monday, March 19, 1990, he and Brewer went to visit with Garza's mother. Since it appeared that his mother was asleep, Garza drove out of the area, but missed a turn and ended up on the street where the victim was babysitting. He then saw the victim pulling into her employer's driveway and decided to stop and visit with her. Brewer, however, testified that the victim had not just pulled into her employer's driveway, but that Garza had actually driven by the employer's house before turning around and stopping. Garza knew the victim from school and claimed to have been a former boyfriend. He also knew the victim babysat overnight during the week.

---

[2] *State v. Garza*, 241 Neb. 934, 492 N.W.2d 32 (1992).

At 11:10 p.m., Garza and Brewer rang the employer's doorbell and the victim answered. She asked Garza what he was doing and told him to leave. Brewer and Garza then left. The employer, who happened to be home on this particular Monday night, had heard the doorbell ring; thinking it strange that someone would come to the house that late at night, she stood at the top of the steps in order to see who was at the door and was thus able at trial to identify Garza as the person who had been at her door.

The following Tuesday night, March 20, or early Wednesday morning, March 21, while driving to the area, Garza asked Brewer if he wanted to "rob" the employer's house. Brewer agreed to the plan, knowing full well that the victim and her employer's daughter would be in the house. Brewer and Garza then returned to the employer's house at approximately 2:30 on the morning of the 21st, with stealing as the avowed purpose.

After cutting the outside telephone line, Garza broke in through a basement window and let Brewer in through the front door. Brewer claims he immediately began looking for things to steal in the living and dining rooms. Brewer stated that sometime thereafter, he "heard the door open . . . looked down the hall and [saw] Garza and [the victim] go into the [employer's daughter's] room and [tell] her to go back to sleep." Thus, it appears that Garza had gone to the upper level of the house, as Brewer then states that sometime later, Garza went downstairs and told Brewer, "'Go have some fun.'" Brewer asserts that he originally refused to go upstairs, but after Garza mocked him, he went to the victim's bedroom. He found the victim on the bed. Her hands were tied over her head, and she was gagged with a scarf and hat but had no injuries. Brewer claims he was in the room for only 5 to 10 minutes, during which time he sexually assaulted the victim.

Brewer then went back downstairs and sat on the couch. Garza returned to the bedroom, then went back downstairs and into the kitchen to get a 14-inch knife, and returned to the bedroom. As Garza went back upstairs, Brewer asked him what he was doing but received no response. Apparently a few seconds later, Brewer went upstairs and stood in the bedroom doorway where he saw Garza pulling away from the victim and "blood spurting in the air." Garza and Brewer went back downstairs and left the house.

According to Brewer, he and Garza then went in the victim's automobile to a location where the stolen items were placed in Garza's automobile. The victim's automobile was then taken to and pushed into the Missouri River. The stolen items were later discarded.

The employer's daughter testified that she woke up at 2:30 a.m. because she heard crying coming from the bedroom where the victim slept, but that when her door was opened, she only saw one man. The daughter stated that for the next 3 hours, she "heard whispering [and] crying [and her] birdcage door slam and [the] bird squeaking." She also "heard footsteps . . . the door slam when they were leaving, and . . . the garage, the garage open and shut."

When Dr. Blaine Roffman, an Omaha pathologist and coroner, was taken into the employer's house, he saw the victim's body lying partially out of the bed in a face-down position: "[The body] was underneath the comforter when I first walked into the bedroom. And when the comforter was removed, the body was face down on the abdomen and the back being visible. . . . [T]here was a blue electrical cord wrapped around the neck, along with a blue scarf and a white hat. And the blue scarf and white hat initially were over the mouth and nose. And there was also pantyhose and a red strap of some type bound around both lower—both feet."

The autopsy evidenced numerous injuries: a deep "traumatic laceration" on the left side of the forehead; a "large area of swelling over the right forehead"; a deep blunt injury "between the eyebrows and upper portion of the nose"; "petechial hemorrhages" around the neck caused by the electrical cord; a "laceration on the . . . inside surface, of the left upper lip"; a blackened left eye "which is a result of hemorrhaging in that soft tissue that surrounds the eye"; injuries caused by vaginal and anal penetration; two dark linear-pattern bruises on the right back side; a bruise on the left shoulder; and a bruise over the right hip. According to Roffman, all of these injuries, which were not life threatening, were inflicted, as evidenced by the bruising and hemorrhaging, while the victim was still alive.

There was also a large, gaping laceration on the right wrist which extended to the bone, severing all of the superficial tendons, as well as producing a 90-percent laceration of the radial artery and a nick in the ulnar artery. In addition, there were seven superficial lacerations on the wrists. Roffman reported that the large wrist laceration was inflicted while the victim was alive and continued to bleed profusely until she died.

In Roffman's opinion, the victim died as a result of three injuries, any one of which, alone, could have killed her: bleeding to death from the laceration on her wrist; strangulation as a result of the scarf, hat, and electrical cord tightly wrapped around her neck; or asphyxiation caused by the scarf and hat covering her mouth and nose and also by the position of her body lying halfway out of the bed with her face turned against the carpet. Roffman pointed out that after any of these injuries, the victim would have been conscious at least 3 to 5 minutes and then died. Roffman also stated that the victim could have been saved by simply untying the cord around her neck, changing the position of the body and removing the

blockage to the mouth and nose, or placing a tourniquet on the arm, depending on which injury had been inflicted at the time.

Thus, if Brewer's testimony that he and Garza left the house immediately after Garza inflicted the wrist laceration and the daughter's testimony that the two left at 5:30 a.m. are accurate, the victim would have suffered for almost 3 hours before she finally died.

Garza has given three separate stories regarding his whereabouts on the morning of the murder. He gave his first version on the day of the murder. During the late morning on March 21, Garza received a telephone call from his brother's girl friend, who told Garza that the police were looking for him in connection with the murder. Before noon, Garza's mother went home in order to take her son to the police station, as she, too, had discovered that the police were looking for him. Shortly thereafter, Garza and his mother went to the Omaha Police Division, arriving there just after noon.

At the police station, Garza told Officer Frank O'Connor that he and Brewer had been with each other on the 20th and 21st and that he stayed the night at Brewer's house. O'Connor testified that Garza said he knew the victim, had dated her a "couple times," and had seen her on the 19th. Garza also told O'Connor that he and Brewer had visited several friends in Omaha and Council Bluffs Tuesday evening and early Wednesday "and then returned to Brewer's residence where they stayed the rest of the night."

After talking to O'Connor, Garza traveled with Deputies Gary Kratina and Sam Christiansen to the office of the Douglas County sheriff for further questioning. Once there, Garza was read his *Miranda* rights and signed a rights advisory form waiving those rights. Kratina testified that Garza admitted knowing the victim and seeing her on March 19. Garza told Kratina that on

the morning of the murder, he was at Brewer's house. Thereafter, Garza agreed to give saliva, fingernail, and hair samples, and to have his photograph taken. Kratina and O'Connor both saw scratches on Garza's arms. Since Garza was then not under arrest, he left the station. That evening Brewer went to the sheriff's department and discussed the killing.

Garza had disappeared but was located and arrested on April 6. After processing, Garza was taken to an interview room where O'Connor and Deputies Craig Madsen and James Westcott of the sheriff's office were present. When asked whether he wanted to talk to the officers, Garza responded "[Y]es." According to O'Connor, "He was quite adamant about that, he did want to, yes, he did want to talk to us." At this time, Westcott left the room to telephone his office with the information that Garza was going to make a statement. O'Connor began to read Garza his *Miranda* rights from a rights advisory form. When Garza was told he had a right to an attorney and to have one present, he stated that he wanted his attorney, and questioning ended.

Madsen then left the room in order to inform the sheriff's office of that development. However, O'Connor remained in the interrogation room with Garza. At the suppression hearing, O'Connor testified that after sitting there several minutes, he, upon Garza's inquiry as to whether Brewer had "spilled his guts," told Garza that Brewer had taken his opportunity to tell his side of the story and had implicated Garza. O'Connor also told Garza that the tests being conducted on blood and semen at the scene would reveal who had been there, when in fact O'Connor did not know whether such tests were then being conducted. Garza then declared that he had been with Brewer but that he, Garza, had not killed the victim. At this point, Madsen returned to the interrogation room, and O'Connor asked Garza whether

what he was saying was being said of his own free will.
Garza replied that yes, he had been there, but that he
had not killed the victim. O'Connor then asked Garza
whether he would like to tell his side of the story, and
Garza said they had gone to the house to "rob" it; that
he had cut the screen and crawled in, entered the house,
looked around, tied up the victim, and then gone down-
stairs, getting a videocassette recorder and other items
while Brewer remained upstairs. Garza admitted hav-
ing sexual intercourse with the victim, after which he
went back downstairs, collected some items, put them
in the automobile, and left. As he and Brewer were in
the automobile, Brewer said he had killed the victim.
In reply to O'Connor's question, Garza said that yes,
he was "there when it happened." When asked whether
he would be willing to give a tape-recorded statement,
Garza repeated several times that it was first degree
murder and "it don't make no difference," but would not
permit a recorded statement.

O'Connor further testified that no promises, threats
of force, or coercion was used, and Garza appeared "to
be rational and understand the rights" explained to him.
Madsen's testimony regarding Garza's statement harmo-
nized with that given by O'Connor. Madsen also testi-
fied that no promises, threats, or coercion was used in an
attempt to coerce Garza to give a statement.

The third and final version of Garza's whereabouts on
the night of the murder occurred when he testified on
his own behalf at trial. On that occasion, Garza denied
ever having made any incriminating statements on April
6 and testified that he was out with Brewer on the 20th
and early morning of the 21st, but that he finally dropped
Brewer off at his house. Garza then went home and
to bed.

Garza also testified that Brewer woke him up "early
morning sometime" and told him that he had "robbed"

the employer's residence and stolen the victim's auto-mobile. Garza agreed to Brewer's request to transfer all of the stolen goods into Garza's automobile. The two then dumped the victim's automobile into the Missouri River. Thereafter, they returned to Garza's house, where Garza's grandmother told them that a babysitter had been killed. Garza claimed that he questioned Brewer about the murder, and Brewer, for the first time, confessed to the killing.

Garza's girl friend, Donna Coffin, testified that on Monday, March 19, Garza had shown her a picture of the victim and told her that he was mad at the victim. The girl friend also stated that a day before the murder Garza had asked her to provide an alibi for him in the event the police were looking for him. The girl friend did not know whether Garza was serious or in regard to what matter she might be questioned. When Garza went to the girl friend's house in April prior to being arrested by the police, Garza told her that he had seen the victim the night of the murder and that he and Brewer had broken into the house through the basement window in order to steal. Garza further told the girl friend that it was not until after they left the employer's residence that Brewer told him he had killed the victim. The girl friend's sister, Chris Coffin, also testified that Garza told her he had broken into the employer's house through a basement window and "robbed" it, but denied killing the victim.

Garza testified that the Coffins, Brewer, Madsen, and O'Connor all lied and committed perjury in their testi-mony, and expressed the view that he was the casualty of a conspiracy to convict him, as only he was telling the truth.[3]

Garza was 16 years old when he committed the crimes lead-ing to his convictions. His murder conviction was based upon

---

[3] *Id*. at 937-43, 492 N.W.2d at 37-41.

felony murder.[4] Garza was sentenced to life imprisonment on the murder conviction and was given a consecutive sentence of 6⅔ to 20 years' imprisonment on the use conviction. As stated earlier, we affirmed his convictions and sentences on direct appeal.[5]

In 2013, Garza filed a motion for postconviction relief seeking resentencing on his murder conviction pursuant to *Miller*.[6] In *Miller*, the U.S. Supreme Court held that a mandatory sentence of life imprisonment without parole for one who commits a homicide while under the age of 18 violates the Eighth Amendment. We determined that *Miller* applied retroactively in *State v. Mantich*.[7]

In Garza's postconviction case, the district court applied *Miller* and *Mantich* and granted postconviction relief in the form of resentencing on the murder conviction.[8] No appeal was taken from that order.

To facilitate resentencing, an evidentiary hearing was held before the district court. Garza offered three exhibits: (1) Department of Correctional Services reclassification action forms, (2) various certificates of achievement he earned while in custody, and (3) the deposition of a neuropsychologist who testified generally about adolescent brain development. Garza also offered testimony of a licensed psychologist who evaluated Garza in preparation for resentencing. The psychologist testified that while in prison, Garza has taken advantage of programs available to him, been both involved and a leader in a program which seeks to reduce recidivism by preparing inmates for successful release, mentored younger inmates, earned his diploma through the GED

---

[4] See Neb. Rev. Stat. § 28-303 (Reissue 1989).

[5] *State v. Garza, supra* note 2.

[6] *Miller v. Alabama, supra* note 1.

[7] *State v. Mantich*, 287 Neb. 320, 842 N.W.2d 716 (2014).

[8] See, *Miller v. Alabama, supra* note 1; *State v. Mantich, supra* note 7.

program, completed a legal research class, and performed several jobs, some of which require earning trust because sharp objects are involved.

While incarcerated, Garza has amassed 182 misconduct reports. As he has grown older and matured, the reports have decreased in frequency and severity. The psychologist testified that young inmates often have a higher number of misconduct reports because they have to prove themselves but that the misconduct reports usually lessen as an inmate establishes himself or herself as someone who cannot be taken advantage of. The psychologist testified that Garza has qualified for "community custody" status every year since 2006 and opined that Garza is at low risk for future acts of violence. At the conclusion of the evidentiary hearing, the district court ordered preparation of a new presentence investigation report and set the case for resentencing.

At the resentencing hearing, the State asked the court to impose a sentence "in the realm of the maximum sentence" allowed by law. The State also reminded the court that Garza's codefendant, who was 18 at the time of the murder, is serving a life sentence. Garza's counsel asked the court to impose a sentence that would make Garza parole eligible "if not [that day], in the very near future." The court also heard remarks from the employer's daughter, now an adult, who spoke about how she and Christina O'Day's family had been affected by the murder. Garza did not make a statement at the resentencing hearing, but submitted a written statement that was included in the presentence report in which he admitted "participat[ing] in the robbery, rape, and murder of Christin[a] O'Day." The report also indicated Garza expressed remorse for his actions.

The sentencing judge stated he had reviewed the presentence report, the trial transcript and exhibits, the police reports, the letters of support offered on behalf of Garza and O'Day, and the mitigating evidence offered by Garza at the evidentiary hearing pursuant to Neb. Rev. Stat. § 28-105.02(2) (Reissue

2016). The court acknowledged and gave credence to Garza's efforts to rehabilitate himself while in prison, but stated it also had "to balance the nature of the offense and what was done to that young lady." The court then sentenced Garza to 90 to 90 years' imprisonment on the first degree murder conviction. That sentence was ordered to be served consecutively to the previously imposed sentence of 6⅔ to 20 years' imprisonment for use of a weapon to commit a felony. The court advised Garza that, assuming he lost no good time, he would be eligible for parole after serving 48 years 4 months and would be mandatorily discharged after 55 years. Garza was given credit for 9,440 days previously served. He timely appeals.

## ASSIGNMENT OF ERROR

Garza's sole assignment of error is that the district court abused its discretion by imposing an excessive sentence.

## STANDARD OF REVIEW

[1,2] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[9] A judicial abuse of discretion exists when the reason or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[10]

## ANALYSIS

Garza presents several arguments in support of his claim that his murder sentence is excessive. First, he contends that his 90-to-90-year sentence of imprisonment amounts to a "de facto life sentence" in violation of his rights under the Eighth Amendment and Due Process Clause.[11] In that regard, he argues that while *Miller* did not categorically ban the punishment of life imprisonment without parole for minors, it did

---

[9] *State v. Cardeilhac*, 293 Neb. 200, 876 N.W. 2d 876 (2016).

[10] *State v. Berney*, 288 Neb. 377, 847 N.W.2d 732 (2014).

[11] Brief for appellant at 15.

note that such a sentence should be "uncommon."[12] Garza also argues that when the sentencing court imposed the 90-to-90-year sentence, it failed to make a specific finding that Garza was that "'rare juvenile offender whose crime reflects irreparable corruption'" as opposed to "'transient immaturity.'"[13] We address each argument in turn.

In *Miller*, the U.S. Supreme Court held the Eighth Amendment forbids a state sentencing scheme that mandates life in prison without the possibility of parole for a juvenile offender convicted of homicide. The *Miller* court reached its conclusion by applying two lines of precedent. First, the Court recognized two previous juvenile cases, *Graham v. Florida*[14] and *Roper v. Simmons*.[15] *Graham* held it violates the Eighth Amendment to sentence a juvenile to life imprisonment without parole for a nonhomicide offense. *Roper* held it violates the Eighth Amendment to sentence a juvenile to death. Both *Graham* and *Roper* announced categorical bans on certain sentencing practices.

In *Mantich*, we held that *Miller* applied retroactively and that therefore, any juvenile sentenced to mandatory life imprisonment without parole could have his or her sentence vacated and the cause remanded for resentencing.[16] We also recognized in *Mantich* that *Miller* did not "categorically bar" the imposition of a sentence of life imprisonment without parole, but, instead, "held that a [sentencing court] must consider specific, individualized factors before handing down a sentence of life imprisonment without parole for a juvenile" convicted of a homicide.[17]

---

[12] See *Miller v. Alabama, supra* note 1, 132 S. Ct. at 2469.

[13] See *id.*

[14] *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

[15] *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

[16] *Miller v. Alabama, supra* note 1; *State v. Mantich, supra* note 7.

[17] *State v. Mantich, supra* note 7, 287 Neb. at 339-40, 842 N.W.2d at 730.

In response to *Miller*, the Nebraska Legislature amended the sentencing laws for juveniles convicted of first degree murder.[18] Those amendments changed the possible penalty for a juvenile convicted of first degree murder from a mandatory sentence of life imprisonment to a "maximum sentence of not greater than life imprisonment and a minimum sentence of not less than forty years' imprisonment."[19] The Legislature also mandated that in determining the sentence for a juvenile convicted of first degree murder, the sentencing judge "shall consider mitigating factors which led to the commission of the offense."[20]

It is against this backdrop that Garza appeals his sentence as excessive. He describes his sentence as a "de facto life sentence" because he will not be eligible for parole until he is 64 years old and will not complete his sentence until he is 71.[21] He argues that he entered prison at age 16 and that most of his adult life will be spent behind bars.

[3] We conclude that Garza's characterization of his sentence as a de facto life sentence is immaterial to our analysis of whether his sentence is excessive. Garza was convicted of felony murder, and as we recently held on appeal from a *Miller* resentencing in *State v. Mantich*,[22] felony murder is a homicide offense. And when a juvenile is convicted of a homicide offense, our analysis is guided by *Miller*, not *Graham*.[23] As we explained in the recent *Mantich* opinion, "under *Miller* a juvenile defendant may be sentenced to life imprisonment

---

[18] See § 28-105.02.

[19] § 28-105.02(1).

[20] § 28-105.02(2).

[21] Brief for appellant at 15.

[22] *State v. Mantich, ante* p. 407, ___ N.W.2d ___ (2016).

[23] *Id*. See, *Miller v. Alabama, supra* note 1; *Graham v. Florida, supra* note 14.

without parole, [so] it is immaterial whether the sentence imposed . . . was a de facto life sentence."[24]

Garza also argues the sentencing court failed to make a specific factual finding of "irreparable corruption"[25] before imposing the sentence of 90 to 90 years' imprisonment. His argument is based in part on the statement in *Montgomery v. Louisiana*,[26] quoting *Miller*, that "life without parole is excessive for all but '"the rare juvenile offender whose crime reflects irreparable corruption."'" We note that recently, in *Tatum v. Arizona*,[27] the U.S. Supreme Court repeated this quote from *Montgomery* when it remanded several first degree murder cases for reconsideration. The cases involved juveniles who were sentenced to life imprisonment without parole, were resentenced after *Miller*, and, upon resentencing, were again given life imprisonment without parole. The Court in *Tatum* vacated all the life sentences and directed that upon remand, the sentencing courts should "address[] the question *Miller* and *Montgomery* require a sentencer to ask: whether the [juvenile] was among the very 'rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility'" as opposed to those "whose crime reflects unfortunate yet transient immaturity."[28]

Both *Miller* and *Tatum* dealt with juvenile defendants who had been sentenced, or resentenced, to life imprisonment without parole for murder. Garza, in contrast, was resentenced to a term of years and is eligible for parole. The requirements of *Miller* were met when Garza was resentenced.

Because Garza was not sentenced to life imprisonment without parole, we find no merit to his argument that the

---

[24] *State v. Mantich, supra* note 22, *ante* at 415-16, ___ N.W.2d at ___.

[25] Brief for appellant at 18. See *Miller v. Alabama, supra* note 1.

[26] *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 734, 193 L. Ed. 2d 599 (2016).

[27] *Tatum v. Arizona*, ___ U.S. ___, 137 S. Ct. 11, ___ L. Ed. 2d ___ (2016).

[28] *Id.*, 137 S. Ct. at 12 (quoting *Montgomery v. Louisiana, supra* note 26).

sentencing court was required by *Miller* or *Tatum* to make a specific finding of "irreparable corruption." We instead analyze Garza's sentence under the familiar standard of review applied to sentences claimed to be excessive.

[4] Garza was convicted of first degree murder, which is a Class IA felony.[29] The penalty for a Class IA felony offense committed by one under the age of 18 years is a maximum sentence of not greater than life imprisonment and a minimum sentence of not less than 40 years' imprisonment.[30] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[31]

[5] We have stated that when imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.[32]

[6] Additionally, § 28-105.02(2) contains a nonexhaustive list of mitigating factors a sentencing court must consider when imposing a sentence for first degree murder on one who was under the age of 18 when he or she committed the crime:

> In determining the sentence of a convicted person under subsection (1) of this section, the court shall consider mitigating factors which led to the commission of the offense. The convicted person may submit mitigating factors to the court, including, but not limited to:

---

[29] § 28-303(2).

[30] § 28-105.02(1).

[31] *State v. Carpenter*, 293 Neb. 860, 880 N.W.2d 630 (2016).

[32] *Id.*

(a) The convicted person's age at the time of the offense;

(b) The impetuosity of the convicted person;

(c) The convicted person's family and community environment;

(d) The convicted person's ability to appreciate the risks and consequences of the conduct;

(e) The convicted person's intellectual capacity; and

(f) The outcome of a comprehensive mental health evaluation of the convicted person conducted by an adolescent mental health professional licensed in this state. The evaluation shall include, but not be limited to, interviews with the convicted person's family in order to learn about the convicted person's prenatal history, developmental history, medical history, substance abuse treatment history, if any, social history, and psychological history.

[7] We have long held that in considering a sentence, the sentencing court is not limited in its discretion to any mathematically applied set of factors.[33] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life.[34]

In resentencing Garza, the district court reviewed the presentence report, the trial transcript and exhibits, the police reports, and all of the information submitted on behalf of Garza and O'Day. The court considered all of the mitigating factors required by § 28-105.02 and acknowledged and gave credence to the changes Garza had made in his life while imprisoned. The court ultimately concluded a lengthy term of imprisonment was warranted due to the nature of Garza's crime and the circumstances surrounding its commission.

---

[33] *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002).

[34] *Id.*

The record supports the court's conclusion that a lengthy term of imprisonment is warranted. The evidence does not suggest Garza acted impulsively; to the contrary, the evidence shows Garza was able to appreciate the risks and consequences of his conduct. He carefully planned the attack in advance and spent hours raping, beating, cutting, and strangling O'Day before she died. He then actively tried to conceal the crime, including disposing of property and lying to the police.

When resentencing Garza, the district court considered all of the relevant sentencing factors, including the considerations required by *Miller*[35] and the statutory factors under § 28-105.02. The court then imposed a sentence within the statutory limits and supported by the record. We find no abuse of discretion, and we find no merit to Garza's claim that his sentence is excessive.

## CONCLUSION

For the foregoing reasons, the sentence of the district court is affirmed.

AFFIRMED.

---

[35] *Miller v. Alabama, supra* note 1.