IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. NATION

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JEREMIAH Y. NATION, APPELLANT.

Filed April 7, 2020.    No. A-19-518.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

Joeeph D. Nigro, Lancaster County Public Defender, and Robert G. Hays for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

### INTRODUCTION

Jeremiah Y. Nation appeals his convictions and sentences for two counts of robbery following a jury trial. Nation argues that the district court for Lancaster County improperly (1) denied his motions to suppress certain evidence seized during a search of his residence, (2) found the evidence presented at trial was sufficient to support his convictions, and (3) imposed excessive sentences. For the reasons that follow, we affirm.

### BACKGROUND

On January 12, 2018, Nation was charged by information with two counts of robbery, each count a Class II felony. The information was later amended to include a habitual criminal enhancement on both counts. The charges arise out of two incidents occurring on June 26 and June 30, 2017, where two Burger King restaurants in Lincoln, Nebraska, were robbed at gunpoint.

- 1 -

FIRST MOTION TO SUPPRESS

On May 21, 2018, Nation filed a motion to suppress evidence discovered during an alleged pre-warrant search of his residence and vehicle on the late evening/early morning of June 30 and July 1, 2017. A hearing on the motion to suppress was held on August 21, 2018.

At the hearing, Nation's trial counsel stated that on the evening of June 30, 2017, law enforcement arrived at Nation's residence and placed him and Kelsey Bomberger, whom Nation lived with at the time, into custody. He argued that prior to the search warrant being issued and served, law enforcement asked Bomberger questions that could have only been asked if a search of the residence had already taken place. The State introduced a certified copy of the search warrant along with the supporting affidavit of Investigator Benjamin Pflanz. Nation's counsel introduced a transcript of Bomberger's June 30 interview with law enforcement and several additional case information reports prepared by law enforcement. The State objected on the basis of relevance. The rulings on the State's objections and the motion to suppress were taken under advisement.

The evidence showed that law enforcement officers were dispatched to a Burger King located at 2805 South 48th Street in Lincoln, Nebraska, at approximately 10:30 p.m. on June 30, 2017. Witnesses described the suspect as a black male dressed in all black clothing. One witness reported the suspect left the scene in a "black Charger or Avenger" and drove westbound on Van Dorn Street. Shortly after, law enforcement located a vehicle matching the description of the suspect's parked in a driveway of a residence on South 35th Street. The vehicle appeared as though it had recently been driven due to a warm engine block and the dome light of the vehicle being on.

Upon arrival, law enforcement gave verbal commands for those inside to exit the residence. After a short time, Bomberger exited the house and was taken into custody. Nation was observed closing the curtains of the kitchen window, obstructing the view of the officers outside, and eventually came outside and was taken into custody. After both Bomberger and Nation exited the residence, law enforcement were informed that two children were asleep inside. The residence was cleared and seized while a search warrant was being obtained. One officer remained inside at the time.

After her interview, Bomberger was transported back to the residence, and a search was conducted pursuant to a signed search warrant shortly thereafter. The search of Bomberger and Nation's residence, and the vehicles located in the driveway, began at approximately 2 a.m. on July 1, 2017. Within the Dodge Charger was a package of BBs, a pair of black rubber gloves, and two $CO_2$ cartridges. Within the home, law enforcement located a large amount of cash, a white plastic bag with red lettering that matched the description of the one used in the robbery earlier that evening, rolls of quarters, a BB gun case, and black pants and a black hoodie sweatshirt. Officers also located a silver and black BB gun, additional cash and rolls of quarters, and a Union Bank deposit bag with Burger King paperwork inside the HVAC system within the residence.

On December 6, 2018, the district court issued an order overruling Nation's first motion to suppress. Exhibits 4-7 were received over the State's objections. No ruling was made on exhibit 3, the transcript of Bomberger's police interview. In its order, the district court explicitly found that "none of the information used to secure the warrant was obtained from what may or may not be described as an illegal entry or impoundment." The district court found that Nation had not met

his burden of showing that an illegal search of the home was performed prior to the issuance of the search warrant.

On January 4, 2019, Nation filed a second motion to suppress, again challenging the alleged pre-warrant search of his residence and vehicle. The motion stated that exhibit 1, a transcript of the preliminary hearing in this case, and exhibit 3, the transcript of Bomberger's police interview, were not received into evidence at the initial hearing and were critical to the issues raised in the motion to suppress. A hearing on the second motion to suppress took place on February 1, 2019.

At the hearing, Nation's counsel offered exhibits 1 and 3, which had not been previously received into evidence. Exhibits 2-7, which had previously been received, were also reintroduced. Arguments were made via the previously-submitted briefs of the parties, and the matter was taken under advisement.

During her interview, Bomberger indicated that she returned home from work at around 6 p.m. on June 30 and Nation left at around 7 p.m. but returned sometime shortly after 8 p.m. and did not leave again to her knowledge. At some point Bomberger took a shower for 20-30 minutes and could not account for Nation's whereabouts at the time. At one point, Investigator Andrew Gallagher and Bomberger had the following exchange:

> INV. GALLAGHER: Uhm, and the other thing is, uhm, th-th-the clothes that were in the bedroom, like, I mean, there's some black sweatpants and like a black sweatshirt. Was he wearing that earlier in the day? That was in the bedroom, on the floor.
> BOMBERGER: I don't think he has black sweatpants.
> INV. GALLAGHER: Well, there's black sweatpants in the bedroom.
> BOMBERGER: I've never seen (inaudible).
> INV. GALLAGHER: They might be slacks, I don't know if they're sweatpants per se, but they were like black pants. So, does he have work slacks that are black or work pants?
> BOMBERGER: Uh huh (yes).

Gallagher also asked about a plastic bag lying around in the bedroom of Bomberger and Nation's residence. He also questioned Bomberger about rolls of quarters located in the basement, and the possibility of some type of airsoft or BB gun being located in the home.

On March 27, 2019, having considered the additional evidence in exhibits 1 and 3, the district court overruled Nation's second motion to suppress on the same basis it had overruled the first motion to suppress.

A jury trial was held on April 3 to 5 and April 8 to 9, 2019. Kaylean Gentry testified that on the evening of June 30, 2017, she was visiting friends at their home near 47th and Van Dorn Streets in Lincoln, Nebraska. At approximately 10:30 p.m. that evening she went outside to her vehicle to buckle car seats for her children when she witnessed an individual dressed in all black, and carrying a white bag, walking toward her vehicle. After seeing her, the man turned the other

way, dropped something on the street, and drove off in a black car she described as either an "Avenger or a Challenger." The man drove westbound on Van Dorn Street.

Officer Brian Ward testified that he was on duty the evening of June 30, 2017, when he was alerted of a robbery over the police scanner. After canvassing the area, Ward saw a black Charger with its dome light on parked in the driveway of a residence on South 35th Street. Ward approached the vehicle, placed his hand near the radiator, and noticed it was still hot. Ward surveyed the area behind the house and looked inside an open window into the kitchen, but did not see anybody at the time. Shortly after, Ward requested additional units to the scene to assist with a possible suspect of the earlier robbery.

Based on the registration of the vehicle, Ward came to believe Nation resided at the residence. This was subsequently verified by Officer Andrew Vocasek through the Lincoln Police Department (LPD) Records Management System. Nation later exited the house and was taken into custody. At that point, Ward and other officers cleared the residence in order to ensure no one else was inside, given the involvement of a firearm in the earlier robbery.

On cross-examination, Ward indicated that he cleared the basement portion of the residence and did not see anything in plain view that appeared as though it had been taken from a robbery.

After the protective sweep, while the search warrant was being obtained, Officer Gregg was tasked with staying inside the entryway while a search warrant was obtained. While there, Gregg did not see anything that appeared related to a robbery.

Alexander Schmidt testified that he was working at the Burger King on 48th and Van Dorn Streets in Lincoln on June 30, 2017. At approximately 10:30 p.m. that evening Schmidt was leaving the restaurant when a man pulled out a handgun and pointed it directly at his face. The man instructed Schmidt to walk back inside the restaurant, toward the manager's office. The man also ordered the other employees to go with them toward the back. In the office, the man pulled out a plastic bag and demanded "big bills and quarters." One of the managers placed a Union Bank deposit bag into the plastic bag. Schmidt testified that the plastic bag was clear or opaque with red writing on it. The man then asked for the phones of everyone in the office, and the store phone.

Schmidt described the man as wearing black pants, a black sweatshirt, a Dri-FIT shirt as a facemask, and wearing his hood over the top of his head. He identified the man as having brown eyes and being an African American male. He described the handgun as black with a silver slide and noticed that it made a rattling noise which made him believe it was not a "real gun." Schmidt testified that the Burger King has a camera that overlooks the front of the store where the registers are located. Video surveillance was introduced from the night of the robbery as exhibit 24.

Terra Roberts, a general manager at the 48th and Van Dorn Burger King, testified that she was working the evening the restaurant was robbed. She testified that she likely took at least $1,000 from the cash registers that evening and put it in the safe in the office. Roberts' testimony reaffirmed Schmidt's description of the suspect's clothing and the firearm and use of a plastic grocery bag to hold the money.

The State introduced as exhibit 25 the Union Bank deposit bag that was found at Nation's residence. Roberts testified that she recognized the bag as the one kept in the restaurant safe because she had "touched it a zillion times" and noticed the words "Burger King" in worn ink near

the top of the bag. She testified that unclaimed paychecks are kept in the bank bag and placed in the safe.

Kara Meints, another manager of the Burger King at 48th and Van Dorn, testified that she was at the restaurant that evening doing the financial books for the month. She testified that the man who robbed the restaurant had his face covered so that only his eyes and part of his nose were visible. She was unable to testify exactly how much money had been taken.

The State introduced exhibit 26, a photocopy of a former Burger King employee's paycheck, which was recovered during the search of Nation's home. She testified that the employee number reflected on the paycheck was "491467" and the first two numbers, "49," are indicative of the store number for the Burger King on 48th and Van Dorn in Lincoln.

Alexis Gruhn testified that she was a crew member at the Burger King at 48th and Holdrege in Lincoln when it was robbed on June 26, 2017. She testified that she was outside at around 11 p.m. when a man dressed in all black approached her and her manager and told them to give him their phones. Her manager, Alicia Anderson, initially refused, but complied when the man pulled out a gun and put it up to her head. Gruhn recalled the man specifically demanding the cash and quarters from the safe.

The State introduced exhibit 27, which is video surveillance from the June 26 robbery. The video depicted the suspect, dressed in all black and wearing black gloves, demanding money from Burger King employees at gunpoint.

Alicia Anderson, was the manager at the 48th and Holdrege Burger King on June 26, 2017, when the restaurant was robbed. She testified that a man wearing a black hoodie sweatshirt, black jeans, and a black mask, pointed a gun at her and told her and Gruhn to walk back to the office where the safe was located. She described the man as having a "mocha brown" skin tone. She testified there was probably $400-$500 in the safe at the time.

Pflanz testified that as an investigator he conducts follow-up on felony investigations, such as robberies. On June 30, 2017, Pflanz was alerted of a robbery that had taken place at 48th and Van Dorn and began listening to the radio dispatch related to the robbery. After reports that a potential suspect had been located, Pflanz did not go to the scene. Instead, he began drafting an affidavit for a search warrant based on the facts that were coming in.

Pflanz spoke with Investigator Drager, who was the responding officer to the robbery at 48th and Van Dorn, and included information that Drager had received from one of the Burger King employees working at the time, Schmidt. At some point, after officers had responded to 2525 South 35th Street where the vehicle of the potential suspect was located, it was determined the vehicle was registered to Nation. Pflanz also learned from another officer that the phones that had been taken from the Burger King were located at multiple intersections on Van Dorn, consistent with the path of travel from the Burger King to Nation's residence.

Pflanz testified that he recognized similarities between the June 30 robbery and the robbery of the 48th and Holdrege Burger King that had taken place a few days earlier. The similarities included the physical description of the suspect, the all black attire, the brandishing of a black handgun with a silver slide, the fact both involved Burger King restaurants, the demand for large bills and quarters, and the similar timeframe each night.

Pflanz testified that "clearing" a residence, or a "protective sweep," is common in cases where evidence of a recent crime may be destroyed or removed prior to the police obtaining a search warrant. When the crime involves a weapon, another purpose is to account for all individuals in the residence and ensure the safety of the officers and the general public. Pflanz testified that he did not include any information about the protective sweep in his affidavit for the search warrant. A search warrant was issued and Pflanz arrived at Nation's residence with the warrant at approximately 2 a.m. on July 1, 2017. At that point, the warrant was read, and a search of the residence was conducted.

Pflanz testified that the search of Nation's residence and the two vehicles in the driveway concluded at 4:22 a.m. The search of the Charger revealed a pair of black gloves, similar to those used in the 48th and Holdrege robbery, a package of BBs, and two silver metallic $CO_2$ cartridges that appeared to belong to a BB gun or pellet gun. Within Nation's residence, in the basement, Pflanz testified he found two ten-dollar rolls of quarters and a plastic case for a handgun or BB gun. Pflanz also located a white plastic grocery bag with red writing in the same bedroom where the gun case was found. A pair of dark shoes, similar to those described by witnesses of the robberies, was also seized.

On cross-examination, Pflanz testified that Nation was not a suspect for either Burger King robbery until the discovery of the black Charger with its dome light on in his driveway. He testified that, prior to obtaining the search warrant, Sergeant Justin Roach mentioned that "there is going to be stuff in [Nation's house]" but no other information regarding evidence discovered during the protective sweep was mentioned. He acknowledged that the warrant was not executed until after Bomberger had been questioned. He was unable to testify whether other officers discovered evidence in plain view during the protective sweep because there was no report of it in any of the police reports. He was unable to say whether any of the officers were aware if a BB gun, opposed to a real firearm, had been used in either robbery.

Sergeant Benjamin Kopsa testified that he was the shift supervisor the night of June 30, 2017, and was in charge of the scene at Nation's residence. Kopsa testified that he ordered a protective sweep of the home in order to ensure no one else was present inside other than the sleeping children, and that he remained in the house for a short time before turning over the task of keeping the residence secure to Gregg.

Kopsa testified that he was involved in the search of the upstairs of the residence and later the basement. In the basement, Kopsa discovered a bank bag, a black and silver BB gun, and some money, consisting of loose bills and rolls of quarters, hidden inside the furnace.

On cross-examination, Kopsa testified that at least four officers were involved in the protective sweep of the residence, and that he did not see anything related to the robbery in plain view. He testified that if any officer had knowledge of the location of evidence prior to the execution of the search warrant, he would have been told about it.

Roach testified that he was on duty the evening of June 30, 2017, and arrived on scene at Nation's residence between 10:45 and 11 p.m. that evening. After Nation was handcuffed and placed in a police cruiser, and given his Miranda warnings, he willingly spoke with Roach. The State played exhibit 98, a recording of that conversation, in which Nation denied leaving the

residence other than a brief period of time between 6 p.m. and 7:30 p.m. to pay an automotive bill. He also consented to a search of his vehicle, the black Charger located at the residence.

Once the search warrant arrived, Roach read the warrant out loud and directed teams of officers to search designated areas of the house. Once inside, Roach discovered a purse on the kitchen counter with cash visible inside. Later in his search, in the laundry room located in the basement, Roach discovered three pairs of black Dickies pants and a black hoodie sweatshirt. Roach described the gun that was later discovered as "a very realistic looking black and silver semiautomatic handgun replica. It was a $CO_2$ BB gun."

On cross-examination, Roach testified that he did not receive any information regarding previously-located evidence prior to the execution of the search warrant. Roach did not recall receiving any information about the style or brand of pants the officers would be looking for, but rather just the color description.

Investigator Lacey Reha testified that she responded to the Burger King at 48th and Van Dorn after the robbery call came out. After taking fingerprints from the Burger King doors, Reha made two stops on her way to Nation's residence and discovered phones taken from the restaurant that had been disposed of. She testified that she discovered three phones between the Burger King and Nation's residence, all along Van Dorn Street. Once on scene at Nation's residence, Reha overtook duties as the photographer at the scene.

Investigator Tu Tran testified that he was involved in taking Nation into custody and processing property that was seized from Nation's residence. One such item was a Union Bank & Trust deposit bag. Tran also counted the money that was found within the deposit bag, which totaled $1,053. Additional money was found in Nation's furnace in the amount of $500 and in Bomberger's purse in the amount of $623. A torn up Burger King paycheck was also found in the Union Bank bag.

On cross-examination, Tran testified that during Bomberger's interview he asked her about the presence of BB guns that looked like real guns within the home. Tran acknowledged that he likely received information from an officer on scene at Nation's residence that would have caused him to inquire into a BB gun rather than a real gun. However, he also testified that, from his experience, many cases involving firearms involve what turn out to be realistic looking BB guns and that he was merely attempting to cover all possibilities while questioning Bomberger.

Jared Minary, a forensic video technician with the LPD, testified that he takes video from crime scenes and uses still images from the video to publish on Crime Stoppers or compare the images to known suspects or vehicles. Minary reviewed video surveillance from the June 26, 2017, Burger King robbery. He testified that the appearance of the glove in the video was consistent with the glove recovered from Nation's vehicle. He was unable to conclusively state that the glove in the surveillance footage and the glove discovered in Nation's vehicle were the exact same glove.

Minary reviewed surveillance footage from the June 30, 2017, Burger King robbery and testified that both the hoodie sweatshirt appearing in the footage and the one recovered from Nation's residence have two seams across the hood. Minary also testified to similarities between surveillance images from both Burger King robberies where the suspect was holding a similar white object and firearm. Minary conceded that he was not able to conclusively determine that the white object and the firearm appearing in the images were the same in both robberies.

Bomberger, who was living with Nation at the time of his arrest, testified she was in a romantic relationship with Nation at the time. She testified that Nation was contributing $200 or $300 per month to live with her. Around the time of his arrest, Nation had recently been fired from Kawasaki and had started a new job at Burger King.

Bomberger testified that on June 30, 2017, she worked until approximately 5 p.m. and then went to the bank to deposit her paycheck. At around 8 p.m. that evening Bomberger arrived home for the night. She testified that Nation was at the home around 9 p.m. or 10 p.m. that evening when she put her children to bed. She then took a shower that lasted between 20 and 30 minutes. At some point Bomberger noticed the police presence outside her home and went outside.

Bomberger testified that the money found in her wallet was withdrawn from her bank account. She also testified that she occasionally keeps rolls of quarters for car washes or to use at the laundromat.

On cross-examination, Bomberger testified that she returned home from the police station prior to the search warrant being executed. Bomberger did not recall being asked about clothing, rolls of quarters, or a BB gun during her interview. She acknowledged that the transcript of her interview showed she was asked about those items. Bomberger testified that she was concerned law enforcement searched her house because she would not want anyone inside without her knowing.

Investigator Gallagher testified that he acquired a search warrant for a black Samsung cell phone that was recovered from Nation's residence and determined to belong to Nation.

On cross-examination, Gallagher testified that, during her initial interview, he asked Bomberger about specific items found within the home but that his questions were based off of information that was received by other officers at the scene. He acknowledged that he asked Bomberger if she had seen Nation with a "handgun or even a toy gun in the past."

Investigator Corey Weinmaster testified that he is a member of the electronic evidence unit with the LPD and works on extracting data from cell phones, computers, and other electronic devices. Weinmaster testified that he conducted a digital examination of the cell phone identified as belonging to Nation. Weinmaster testified at length regarding the process of extracting electronic data from a cell phone.

After conducting an extraction of the data on Nation's cell phone, Weinmaster identified Google searches for "burger king lincoln, ne" and "what time does the burger king lobby close," which were searched for on June 26, 2017. Other similar searches related to Burger King were made on June 13 and June 22. Weinmaster also retrieved a history from "Facebook Messenger" which included a conversation between Nation and Bomberger from June 26, 2017:

> BOMBERGER: Money is nice.
> BOMBERGER: U know I just want YOU
> BOMBERGER: But I'm w the shit
> NATION: And you got that already . . . you know what we don't have yet . . . exactly! So let's get it!

Weinmaster also extracted images from Nation's cell phone that were clicked on after a particular search was made on the phone. The images retrieved were photos of the exterior of the

Burger King restaurants located at 48th and Van Dorn and 48th and Holdrege. There was also a Facebook Messenger conversation between Nation and Bobby McMillian that took place on June 27, 2017, beginning at 6:49 a.m.:

NATION: You see the news cuz? Lol Its on there
MCMILLIAN: Lol I'm bout to now
NATION: No video, no nothing cuz!
MCMILLIAN: Lol ima watch I got it on channel now
MCMILLIAN: I seen it you good lol
MCMILLIAN: Delete this shit I'm deleting it now
NATION: Already

Exhibit 123 showed emails from Wells Fargo to "nationjeremiah@gmail.com" which reflected an ATM receipt from a cash deposit made on June 27, 2017, for an amount of $281. There were also deposits for separate amounts of $25, $24, and $17 at another ATM location.

After the conclusion of Weinmaster's testimony, the State rested. Nation moved to dismiss on the basis that the State failed to establish a prima facie case on either count. That motion was overruled. Nation rested his defense without presenting any evidence. After both parties rested, Nation moved for a directed verdict on each of the two counts on the basis that the evidence adduced by the State was insufficient to allow a reasonable juror to find beyond a reasonable doubt that Nation was guilty of the charges. That motion was overruled. Closing arguments were given by the parties and the matter was submitted to the jury.

After deliberation, the jury returned a unanimous verdict of guilty on both counts against Nation. A presentence investigation report (PSI) was ordered by the court.

A sentencing hearing was held on May 15, 2019. At the hearing, the State presented evidence of Nation's prior convictions for the purposes of a sentencing enhancement under Neb. Rev. Stat. § 29-2221 (Reissue 2016). Other than the amount of time-served for purposes of jail credit, Nation did not offer any additions or corrections to the PSI. Nation's counsel asked that the court impose the statutory minimum and order the sentences on the two robbery charges to run concurrently due to the similar nature of the crimes and the minimal violence involved. After considering Nation's criminal history and the information in the PSI, the district court sentenced Nation to 20 to 40 years' imprisonment on both counts, with the sentences to run consecutively. Nation received credit for four days' time served. This appeal followed.

## ASSIGNMENTS OF ERROR

Nation assigns as error, consolidated and restated, that (1) the district court erred in overruling his motions to suppress evidence, (2) the evidence adduced at trial was insufficient to sustain his convictions, and (3) the district court imposed an excessive sentence.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether

those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Hartzell*, 304 Neb. 82, 933 N.W.2d 441 (2019). When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress. *Id*.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Garza*, 295 Neb. 434, 888 N.W.2d 526 (2016). A judicial abuse of discretion exists when the reason or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

ANALYSIS

MOTIONS TO SUPPRESS

Nation's first two assignments of error allege that the district court erred in denying his motion to suppress and second motion to suppress. Nation argues that the questions officers asked Bomberger during her initial interview, prior to the execution of the valid search warrant, could only have been asked if a search of the residence had already been done. We disagree.

Nation does not challenge the seizure of the premises during the time the search warrant was being obtained, nor the validity of the search warrant itself, but rather claims a warrantless search was conducted prior to a valid warrant being obtained. Regarding a motion to suppress, the initial burden of proof is on the movant to establish a prima facie case of an unconstitutional search and seizure, and when such prima facie case has been established, the burden of proof shifts to the State to establish that the search and seizure were constitutionally permissible. *State v. Vrtiska*, 225 Neb. 454, 406 N.W.2d 114 (1987).

In this case, whether law enforcement conducted a pre-warrant search of the premises was a factual dispute to be determined by the district court. As previously mentioned, in reviewing a trial court's ruling on a motion to suppress, we review the trial court's factual findings for clear error. *State v. Hartzell, supra*. Based on our review of the record, we cannot say the district court committed clear error in determining that a pre-warrant search of Nation's residence was not conducted during the legitimate protective sweep (which, notably, Nation does not challenge).

Nation takes issue with questions asked to Bomberger regarding the presence of black pants and a black sweatshirt on the bedroom floor; a plastic bag "laying around somewhere;" rolls of quarters in the basement; and any weapons or firearms, including an airsoft, BB, or toy gun in the residence. Because the motion to suppress was denied pretrial, and again at trial on Nation's

renewed objection, we consider all of the evidence, both from trial and from the hearings on the motion to suppress. See *id*.

With the exception of the BB gun that was recovered from inside the furnace, and some items of clothing that were found in the washing machine, all of the items Nation addresses were located in areas within plain view throughout the residence. Gallagher asked about clothing and a plastic bag lying around on the floor of the bedroom. This was consistent with Roach's testimony that the clothing was discovered in the laundry area attached to the nonconforming bedroom. Furthermore, Gallagher had information regarding the robbery suspect's clothing, and what officers should be looking for, from witness reports. Exhibit 57 shows the plastic bag that was later seized was lying on the bedroom floor near the bed when recovered. Exhibits 45 and 46, and supporting testimony from Pflanz, show that at least one roll of quarters was discovered on a television stand in the basement living room. This was another area visible to officers conducting the protective sweep prior to the execution of the search warrant.

Several law enforcement officers also testified that through their experience and training, realistic-looking BB or airsoft guns are commonly used in robberies. Furthermore, victims of both robberies testified that the firearm used made a "rattling" noise when the suspect moved it. In fact, Schmidt, one of the Burger King employees, testified that he "kind of figured that it wasn't a real gun" when initially confronted by the suspect. We cannot say it was clear error for the district court to determine that these facts combined failed to establish that an impermissible pre-warrant search took place. Nation has not met his burden of showing an impermissible search took place.

Nation also argues that the State's alternative argument, that even if an impermissible pre-warrant search took place the inevitable discovery or independent source doctrines should apply, is inapplicable to this case. While we have already determined Nation did not meet his burden of showing a pre-warrant search took place and, therefore, need not discuss the merits of this argument, we briefly note that even if Nation had met this burden, the seized evidence would nevertheless be admissible under the "independent source doctrine." The crux of the "independent source" rule is that even if there is illegal police conduct, evidence should not be excluded "if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" *State v. Valdez*, 5 Neb. App. 506, 523, 562 N.W.2d 64, 76 (1997) (citing *Segura v. United States*, 468 U.S. 796, 805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)).

It is clear to us that even if there was an impermissible pre-warrant search in this case, the evidence that was seized from Nation's residence nevertheless would have been obtained pursuant to the execution of the search warrant. We note that Nation has not and does not challenge the validity of the search warrant. The district court found, and we agree, that the decision to obtain a search warrant was not based on any information obtained during the alleged illegal entry and impoundment. Pflanz testified that, despite not being on scene at Nation's residence, he began drafting an affidavit for the search warrant based on the facts that he received from other law enforcement officials, including information regarding the suspect's vehicle that ultimately led to Nation's residence. He also testified that he did not include any information obtained during the protective sweep in his affidavit. We find this scenario analogous to the facts in *State v. Valdez*, 5 Neb. App. at 524, 562 N.W.2d at 76, and similarly hold:

In this instance, it is clear that none of the information contained in the affidavit was acquired as a result of either the entry or the impoundment. Therefore, even if both the entry and the impoundment of the [Defendant's] home were illegal, the evidence would have been discovered regardless through the legal means of the search warrant.

SUFFICIENCY OF EVIDENCE

Nation's next three assignments of error go to the sufficiency of the evidence presented at trial. Nation contends that the district court erred in overruling his motion to dismiss at the conclusion of the State's presentation of evidence and his motion for directed verdict after all evidence had been presented. He also generally assigns that the evidence is insufficient to support his convictions. We disagree.

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Rothenberger*, 294 Neb. 810, 885 N.W.2d 23 (2016). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id*.

As previously mentioned, we do not resolve conflicts in evidence, pass on the credibility of the witnesses, or reweigh the evidence on appeal. See *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

Under Neb. Rev. Stat. § 28-324 (Reissue 2016), "[a] person commits robbery if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever." Nation's argument regarding the sufficiency of evidence relies exclusively on the premise that "[t]he only evidence presented at trial that connected [Nation] to either robbery was the evidence seized during the search of [his] residence." Brief for appellant at 39. Because we have already determined that the evidence seized from Nation's residence was the result of a search pursuant to a lawful warrant, and was properly admitted, we find no merit in these assignments of error. The evidence in this case was overwhelming and sufficient for the jury to find that the essential elements of robbery had been met beyond a reasonable doubt on both charges. This argument fails.

EXCESSIVE SENTENCES

Nation's final assignment of error is that the district court imposed excessive sentences on each count of robbery insomuch as the court (1) ordered the sentences to be served consecutive, rather than concurrent, to each other, (2) failed to give adequate weight to certain sentencing factors, and (3) gave excessive weight to unsubstantiated conclusions that were overemphasized in the PSI. These arguments fail.

When a trial court's sentence is within the statutory guidelines, the sentence will only be disturbed by an appellate court when an abuse of discretion is shown. *State v. Savage*, 301 Neb.

873, 920 N.W.2d 692 (2018). In this case, Nation's sentences were enhanced under Nebraska's habitual criminal statute, § 29-2221. Under Nebraska law, the mandatory minimum Nation could have been sentenced under each charge was a term of 10 years' imprisonment and the maximum term was not more than 60 years' imprisonment. Nation was sentenced to 20 to 40 years' imprisonment on each count. Accordingly, each sentence is well-within the statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Nation first argues that the district court should have ordered his sentences be served concurrently, rather than consecutively. Nation argues that because the district court believed the two robbery charges were similar enough to deny his motion to sever, and therefore try together, the same rationale should apply to sentencing. We disagree. Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015). The charges in this case involved two separate robberies, on two separate dates, and each involved a distinct group of victims. While certain evidence of each robbery was similar in nature, and at times overlapped, this is insufficient to conclude that the district court abused its discretion in ordering the sentences to run consecutively.

Nation next argues that the district court abused its discretion by failing to give adequate weight to certain sentencing factors, such as his education, employment history, the impact the sentence will have on his ability to support his family, and the "low level of violence involved in the robberies." Brief for appellant at 43. At the sentencing hearing, the district court recognized that Nation had previously been convicted of multiple felonies, including previous robberies, and was on parole for those offenses. The court also noted that it had considered "the nature and circumstances of the crimes, the history, character, and condition of the defendant." There is no indication that the district court failed to consider any of the relevant sentencing factors, nor that it considered any improper ones.

Nation also argues that the district court gave excessive weight to "unsubstantiated and misleading conclusions about several categories [in the PSI] bearing on [Nation's] risk to offend." Brief for appellant at 44. However, the record is clear that both Nation and his counsel were given the opportunity to correct and/or amend the PSI at the sentencing hearing, but declined to do so. Now on appeal, Nation specifically takes issue with information included in the PSI. Absent plain error, an issue not raised to the district court will not be considered by an appellate court on appeal. *State v. Kays*, 289 Neb. 260, 854 N.W.2d 783 (2014).

We find that the district court did not abuse its discretion in sentencing Nation to sentences of 20 to 40 years' imprisonment on each count and ordering the terms to be served consecutively.

CONCLUSION

We conclude the district court did not err in overruling Nation's motions to suppress. We also conclude, after viewing the evidence in the light most favorable to the prosecution, that the evidence adduced at trial was sufficient to support a finding of guilt by the jury. Finally, we conclude the district court did not abuse its discretion in sentencing Nation. Accordingly, Nation's convictions and sentences are affirmed.

AFFIRMED.